CLEVELAND BOARD OF EDUCATION ET AL. *v.*
LaFLEUR ET AL.

No. 72–777.  Argued October 15, 1973—Decided January 21, 1974*

---

*Together with No. 72–1129, *Cohen* v. *Chesterfield County School Board et al.*, on certiorari to the United States Court of Appeals for the Fourth Circuit.

STEWART, J., delivered the opinion of the Court, in which BREN-
NAN, WHITE, MARSHALL, and BLACKMUN, JJ., joined. DOUGLAS,
J., concurred in the result. POWELL, J., filed an opinion concurring
in the result, *post*, p. 651. REHNQUIST, J., filed a dissenting opinion,
in which BURGER, C. J., joined, *post*, p. 657.

*Charles F. Clarke* argued the cause and filed a brief
for petitioners in No. 72–777. *Philip J. Hirschkop* argued
the cause for petitioner in No. 72–1129. With him on
the brief was *John B. Mann.*

*Jane M. Picker* argued the cause for respondents in
No. 72–777. With her on the brief were *Rita Page
Reuss* and *Sidney Picker, Jr. Samuel W. Hixon III*
argued the cause for respondents in No. 72–1129. With
him on the brief was *Frederick T. Gray.*†

†*Andrew J. Ruzicho* filed a brief for the International Association
of Official Human Rights Agencies as *amicus curiae* urging affirmance
in No. 72–777. *Philip J. Tierney* filed a brief for the Maryland Com-
mission on Human Relations as *amicus curiae* urging reversal in
No. 72–1129. Briefs of *amici curiae* urging affirmance in No. 72–1129
were filed by *Andrew P. Miller,* Attorney General, and *Walter H.
Ryland,* Assistant Attorney General, for the Commonwealth of Vir-

Mr. Justice Stewart delivered the opinion of the Court.

The respondents in No. 72–777 and the petitioner in No. 72–1129 are female public school teachers. During the 1970–1971 school year, each informed her local school board that she was pregnant; each was compelled by a mandatory maternity leave rule to quit her job without pay several months before the expected birth of her child. These cases call upon us to decide the constitutionality of the school boards' rules.

I

Jo Carol LaFleur and Ann Elizabeth Nelson, the respondents in No. 72–777, are junior high school teachers employed by the Board of Education of Cleveland, Ohio. Pursuant to a rule first adopted in 1952, the school board requires every pregnant school teacher to take maternity leave without pay, beginning five months before the expected birth of her child. Application for such leave must be made no later than two weeks prior to the date of departure. A teacher on maternity leave is not allowed

ginia, and by *Gordon Dean Booth, Jr., Richard S. Maurer,* and *Sidney F. Davis* for Delta Air Lines, Inc. Briefs of *amici curiae* urging reversal in No. 72–1129 and affirmance in No. 72–777 were filed by *Solicitor General Bork, Assistant Attorney General Pottinger, Louis F. Claiborne, Joseph T. Eddins,* and *Beatrice Rosenberg* for the United States; by *David Rubin* and *Jerry D. Anker* for the National Education Assn. et al.; by *Winn Newman* and *Ruth Weyand* for the International Union of Electrical, Radio and Machine Workers, AFL–CIO; by *Theodore R. Mann, Joseph B. Robison, Sylvia Roberts, Ruth Bader Ginsburg, Melvin L. Wulf,* and *John Ligtenberg* for the American Civil Liberties Union et al.; and by *Paul O. H. Pigman* for Margaret M. Broussard. *Evelle J. Younger,* Attorney General, *Elizabeth Palmer,* Assistant Attorney General, and *Joanne Condas,* Deputy Attorney General, filed a brief for the California Department of Human Resources Development as *amicus curiae.*

to return to work until the beginning of the next regular school semester which follows the date when her child attains the age of three months. A doctor's certificate attesting to the health of the teacher is a prerequisite to return; an additional physical examination may be required. The teacher on maternity leave is not promised re-employment after the birth of the child; she is merely given priority in reassignment to a position for which she is qualified. Failure to comply with the mandatory maternity leave provisions is ground for dismissal.[1]

---

[1] The Cleveland rule provides:

"Any married teacher who becomes pregnant and who desires to return to the employ of the Board at a future date may be granted a maternity leave of absence without pay.

"APPLICATION A maternity leave of absence shall be effective not less than *five (5) months before the expected date* of the normal birth of the child. Application for such leave shall be forwarded to the Superintendent at least *two (2) weeks before the effective date of the leave of absence.* A leave of absence without pay shall be granted by the Superintendent for a period not to exceed *two (2) years.*

"REASSIGNMENT A teacher may return to service from maternity leaves not earlier than the *beginning of the* regular school semester which follows the child's age of *three (3) months.* In unusual circumstances, exceptions to this requirement may be made by the Superintendent with the approval of the Board. *Written* request for return to service from maternity leave must reach the Superintendent at least six (6) weeks prior to the beginning of the semester when the teacher expects to resume teaching and shall be accompanied by a doctor's certificate stating the health and physical condition of the teacher. The Superintendent may require an additional physical examination.

"When a teacher qualifies to return from maternity leave, she shall have priority in reassignment to a vacancy for which she is qualified under her certificate, but she shall not have prior claim to the exact position she held before the leave of absence became effective.

"*A teacher's failure to follow the above rules for maternity leave of absence shall be construed as termination of contract or as grounds for dismissal.*" (Emphasis in original.)

Neither Mrs. LaFleur nor Mrs. Nelson wished to take an unpaid maternity leave; each wanted to continue teaching until the end of the school year.[2] Because of the mandatory maternity leave rule, however, each was required to leave her job in March 1971.[3] The two women then filed separate suits in the United States District Court for the Northern District of Ohio under 42 U. S. C. § 1983, challenging the constitutionality of the maternity leave rule. The District Court tried the cases together, and rejected the plaintiffs' arguments. 326 F. Supp. 1208. A divided panel of the United States Court of Appeals for the Sixth Circuit reversed, finding the Cleveland rule in violation of the Equal Protection Clause of the Fourteenth Amendment.[4] 465 F. 2d 1184.

The petitioner in No. 72–1129, Susan Cohen, was employed by the School Board of Chesterfield County, Virginia. That school board's maternity leave regulation requires that a pregnant teacher leave work at least four months prior to the expected birth of her child. Notice

[2] Mrs. LaFleur's child was born on July 28, 1971; Mrs. Nelson's child was born during August of that year.

[3] Effective February 1, 1971, the Cleveland regulation was amended to provide that only teachers with one year of continuous service qualified for maternity leave; teachers with less than one year were required to resign at the beginning of the fifth month of pregnancy. Since Mrs. Nelson had less than a year of service at the time she notified her principal that she was pregnant, the school board originally required her to resign her teaching position. The school board has since conceded that the February 1 amendment did not apply to Mrs. Nelson, since it was enacted after her contract of employment was executed. Pursuant to that concession, the board has placed Mrs. Nelson, like Mrs. LaFleur, on mandatory leave.

[4] Chief Judge Phillips filed a separate opinion, dissenting in part and concurring in part. He felt that the portion of the challenged regulation requiring maternity leave at the beginning of the fifth month of pregnancy was constitutional; he agreed with the majority, however, that the three-month post-delivery waiting period before becoming eligible to return to teaching was unconstitutional.

in writing must be given to the school board at least six months prior to the expected birth date. A teacher on maternity leave is declared re-eligible for employment when she submits written notice from a physician that she is physically fit for re-employment, and when she can give assurance that care of the child will cause only minimal interference with her job responsibilities. The teacher is guaranteed re-employment no later than the first day of the school year following the date upon which she is declared re-eligible.[5]

---

[5] The Chesterfield County rule provides:

"MATERNITY PROVISIONS

"a. Notice in writing must be given to the School Board at least six (6) months prior to the date of expected birth.

"b. Termination of employment of an expectant mother shall become effective at least four (4) months prior to the expected birth of the child. Termination of employment may be extended if the superintendent receives written recommendations from the expectant mother's physician and her principal, and if the superintendent feels that an extension will be in the best interest of the pupils and school involved.

"c. Maternity Leave

"(1) Maternity leave must be requested in writing at the time of termination of employment.

"(2) Maternity leave will be granted only to those persons who have a record of satisfactory performance.

"(3) An individual will be declared eligible for re-employment when she submits written notice from her physician that she is physically fit for full-time employment and when she can give full assurance that care of the child will cause minimal interference with job responsibilities.

"(4) Re-employment will be guaranteed no later than the first day of the school year following the date that the individual was declared eligible for re-employment.

"(5) All personnel benefits accrued, including seniority, will be retained during maternity leave unless the person concerned shall have accepted other employment.

"(6) The school system will have discharged its responsibility under this policy after offering re-employment for the first vacancy

Mrs. Cohen informed the Chesterfield County School Board in November 1970, that she was pregnant and expected the birth of her child about April 28, 1971.[6] She initially requested that she be permitted to continue teaching until April 1, 1971.[7] The school board rejected the request, as it did Mrs. Cohen's subsequent suggestion that she be allowed to teach until January 21, 1971, the end of the first school semester. Instead, she was required to leave her teaching job on December 18, 1970. She subsequently filed this suit under 42 U. S. C. § 1983 in the United States District Court for the Eastern District of Virginia. The District Court held that the school board regulation violates the Equal Protection Clause, and granted appropriate relief. 326 F. Supp. 1159. A divided panel of the Fourth Circuit affirmed, but, on rehearing en banc, the Court of Appeals upheld the constitutionality of the challenged regulation in a 4–3 decision. 474 F. 2d 395.

We granted certiorari in both cases, 411 U. S. 947, in order to resolve the conflict between the Courts of Appeals regarding the constitutionality of such mandatory maternity leave rules for public school teachers.[8]

---

that occurs after the individual has been declared eligible for re-employment."

[6] Mrs. Cohen's child was in fact born on May 2.

[7] Unlike the Cleveland rule, n. 1, *supra,* the Chesterfield County regulation allows the superintendent of schools to extend a teacher's employment beyond the normal cutoff date, if he determines that such action is in the best interests of the students and school involved. See n. 5, *supra.*

[8] Apart from the cases here under review, there are at least three other reported federal appellate opinions dealing with the constitutionality of mandatory maternity leave regulations. Compare *Green v. Waterford Board of Education,* 473 F. 2d 629 (CA2), and *Buckley v. Coyle Public School System,* 476 F. 2d 92 (CA10) (both invalidating mandatory leave rules for pregnant public school teachers)

## II

This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause

with *Schattman* v. *Texas Employment Comm'n,* 459 F. 2d 32 (CA5) (upholding a leave policy of a state agency).

For opinions of the district courts dealing with mandatory maternity leaves, see, *e. g., Heath* v. *Westerville Board of Education,* 345 F. Supp. 501 (SD Ohio); *Pocklington* v. *Duval County School Board,* 345 F. Supp. 163 (MD Fla.); *Bravo.* v. *Board of Education of the City of Chicago,* 345 F. Supp. 155 (ND Ill.); *Williams* v. *San Francisco Unified School District,* 340 F. Supp. 438 (ND Cal.); *Seaman* v. *Spring Lake Park Independent School District,* 363 F. Supp. 944 (Minn.); *Monell* v. *Department of Social Services,* 357 F. Supp. 1051 (SDNY).

Cf. *Struck* v. *Secretary of Defense,* 460 F. 2d 1372 (CA9), vacated and remanded to consider the issue of mootness, 409 U. S. 1071; *Gutierrez* v. *Laird,* 346 F. Supp. 289 (DC); *Robinson* v. *Rand,* 340 F. Supp. 37 (Colo.) (all dealing with Air Force regulations requiring separation of pregnant personnel).

The practical impact of our decision in the present cases may have been somewhat lessened by several recent developments. At the time that the teachers in these cases were placed on maternity leave, Title VII of the Civil Rights Act of 1964, 78 Stat. 253, 42 U. S. C. § 2000e *et seq.,* did not apply to state agencies and educational institutions. 42 U. S. C. §§ 2000e (b) and 2000e-1. On March 24, 1972, however, the Equal Employment Opportunity Act of 1972 amended Title VII to withdraw those exemptions. Pub. L. 92-261, 86 Stat. 103. Shortly thereafter, the Equal Employment Opportunity Commission promulgated guidelines providing that a mandatory leave or termination policy for pregnant women presumptively violates Title VII. 29 CFR § 1604.10, 37 Fed. Reg. 6837. While the statutory amendments and the administrative regulations are, of course, inapplicable to the cases now before us, they will affect like suits in the future.

In addition, a number of other federal agencies have promulgated regulations similar to those of the Equal Employment Opportunity Commission, forbidding discrimination against pregnant workers with regard to sick leave policies. See, *e. g.,* 5 CFR § 630.401 (b) (Civil

of the Fourteenth Amendment. *Roe* v. *Wade,* 410 U. S. 113; *Loving* v. *Virginia,* 388 U. S. 1, 12; *Griswold* v. *Connecticut,* 381 U. S. 479; *Pierce* v. *Society of Sisters,* 268 U. S. 510; *Meyer* v. *Nebraska,* 262 U. S. 390. See also *Prince* v. *Massachusetts,* 321 U. S. 158; *Skinner* v. *Oklahoma,* 316 U. S. 535. As we noted in *Eisenstadt* v. *Baird,* 405 U. S. 438, 453, there is a right "to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child."

By acting to penalize the pregnant teacher for deciding to bear a child, overly restrictive maternity leave regulations can constitute a heavy burden on the exercise of these protected freedoms. Because public school maternity leave rules directly affect "one of the basic civil rights of man," *Skinner* v. *Oklahoma, supra,* at 541, the Due Process Clause of the Fourteenth Amendment requires that such rules must not needlessly, arbitrarily, or capriciously impinge upon this vital area of a teacher's constitutional liberty. The question before us in these cases is whether the interests advanced in support of the rules of the Cleveland and Chesterfield County School Boards can justify the particular procedures they have adopted.

The school boards in these cases have offered two essentially overlapping explanations for their mandatory maternity leave rules. First, they contend that the firm cutoff dates are necessary to maintain continuity of classroom instruction, since advance knowledge of when

---

Service Commission); 41 CFR § 60-20.3 (g) (Office of Federal Contract Compliance). See generally Koontz, Childbirth and Child Rearing Leave: Job-Related Benefits, 17 N. Y. L. F. 480, 487–490; Comment, Love's Labors Lost: New Conceptions of Maternity Leaves, 7 Harv. Civ. Rights-Civ. Lib. L. Rev. 260, 280–281. We, of course, express no opinion as to the validity of any of these regulations.

a pregnant teacher must leave facilitates the finding and hiring of a qualified substitute. Secondly, the school boards seek to justify their maternity rules by arguing that at least some teachers become physically incapable of adequately performing certain of their duties during the latter part of pregnancy. By keeping the pregnant teacher out of the classroom during these final months, the maternity leave rules are said to protect the health of the teacher and her unborn child, while at the same time assuring that students have a physically capable instructor in the classroom at all times.[9]

It cannot be denied that continuity of instruction is a significant and legitimate educational goal. Regulations requiring pregnant teachers to provide early notice of their condition to school authorities undoubtedly facilitate administrative planning toward the important

---

[9] The records in these cases suggest that the maternity leave regulations may have originally been inspired by other, less weighty, considerations. For example, Dr. Mark C. Schinnerer, who served as Superintendent of Schools in Cleveland at the time the leave rule was adopted, testified in the District Court that the rule had been adopted in part to save pregnant teachers from embarrassment at the hands of giggling schoolchildren; the cutoff date at the end of the fourth month was chosen because this was when the teacher "began to show." Similarly, at least several members of the Chesterfield County School Board thought a mandatory leave rule was justified in order to insulate schoolchildren from the sight of conspicuously pregnant women. One member of the school board thought that it was "not good for the school system" for students to view pregnant teachers, "because some of the kids say, my teacher swallowed a water melon, things like that."

The school boards have not contended in this Court that these considerations can serve as a legitimate basis for a rule requiring pregnant women to leave work; we thus note the comments only to illustrate the possible role of outmoded taboos in the adoption of the rules. Cf. *Green* v. *Waterford Board of Education*, 473 F. 2d, at 635 ("Whatever may have been the reaction in Queen Victoria's time, pregnancy is no longer a dirty word").

objective of continuity. But, as the Court of Appeals for the Second Circuit noted in *Green* v. *Waterford Board of Education*, 473 F. 2d 629, 635:

> "Where a pregnant teacher provides the Board with a date certain for commencement of leave . . . that value [continuity] is preserved; an arbitrary leave date set at the end of the fifth month is no more calculated to facilitate a planned and orderly transition between the teacher and a substitute than is a date fixed closer to confinement. Indeed, the latter . . . would afford the Board more, not less, time to procure a satisfactory long-term substitute." (Footnote omitted.)

Thus, while the advance-notice provisions in the Cleveland and Chesterfield County rules are wholly rational and may well be necessary to serve the objective of continuity of instruction, the absolute requirements of termination at the end of the fourth or fifth month of pregnancy are not. Were continuity the only goal, cut-off dates much later during pregnancy would serve as well as or better than the challenged rules, providing that ample advance notice requirements were retained. Indeed, continuity would seem just as well attained if the teacher herself were allowed to choose the date upon which to commence her leave, at least so long as the decision were required to be made and notice given of it well in advance of the date selected.[10]

In fact, since the fifth or sixth month of pregnancy

---

[10] It is, of course, possible that either premature childbirth or complications in the latter stages of pregnancy might upset even the most careful plans of the teacher, the substitute, and the school board. But there is nothing in these records to indicate that such emergencies could not be handled, as are all others, through the normal use of the emergency substitute teacher process. See *Green, supra,* at 635–636.

will obviously begin at different times in the school year for different teachers, the present Cleveland and Chesterfield County rules may serve to hinder attainment of the very continuity objectives that they are purportedly designed to promote. For example, the beginning of the fifth month of pregnancy for both Mrs. LaFleur and Mrs. Nelson occurred during March of 1971. Both were thus required to leave work with only a few months left in the school year, even though both were fully willing to serve through the end of the term.[11] Similarly, if continuity were the only goal, it seems ironic that the Chesterfield County rule forced Mrs. Cohen to leave work in mid-December 1970 rather than at the end of the semester in January, as she requested.

We thus conclude that the arbitrary cutoff dates embodied in the mandatory leave rules before us have no rational relationship to the valid state interest of preserving continuity of instruction. As long as the teachers are required to give substantial advance notice of their condition, the choice of firm dates later in pregnancy would serve the boards' objectives just as well, while imposing a far lesser burden on the women's exercise of constitutionally protected freedom.

The question remains as to whether the cutoff dates at the beginning of the fifth and sixth months can be justified on the other ground advanced by the school boards—the necessity of keeping physically unfit teachers out of the classroom. There can be no doubt that such an objective is perfectly legitimate, both on educational and safety grounds. And, despite the plethora of conflicting medical testimony in these cases, we can as-

---

[11] Indeed, it is somewhat difficult to view the Cleveland mandatory leave rule as seriously furthering the goal of continuity, since the rule requires only two weeks' advance notice before the leave is to commence.

sume, *arguendo*, that at least some teachers become physically disabled from effectively performing their duties during the latter stages of pregnancy.

The mandatory termination provisions of the Cleveland and Chesterfield County rules surely operate to insulate the classroom from the presence of potentially incapacitated pregnant teachers. But the question is whether the rules sweep too broadly. See *Shelton* v. *Tucker,* 364 U. S. 479. That question must be answered in the affirmative, for the provisions amount to a conclusive presumption that every pregnant teacher who reaches the fifth or sixth month of pregnancy is physically incapable of continuing. There is no individualized determination by the teacher's doctor—or the school board's—as to any particular teacher's ability to continue at her job. The rules contain an irrebuttable presumption of physical incompetency, and that presumption applies even when the medical evidence as to an individual woman's physical status might be wholly to the contrary.

As the Court noted last Term in *Vlandis* v. *Kline,* 412 U. S. 441, 446, "permanent irrebuttable presumptions have long been disfavored under the Due Process Clauses of the Fifth and Fourteenth Amendments." In *Vlandis,* the Court declared unconstitutional, under the Due Process Clause of the Fourteenth Amendment, a Connecticut statute mandating an irrebuttable presumption of nonresidency for the purposes of qualifying for reduced tuition rates at a state university. We said in that case, *id.,* at 452:

> "[I]t is forbidden by the Due Process Clause to deny an individual the resident rates on the basis of a permanent and irrebuttable presumption of nonresidence, when that presumption is not necessarily or universally true in fact, and when the State has

reasonable alternative means of making the crucial determination."

Similarly, in *Stanley* v. *Illinois,* 405 U. S. 645, the Court held that an Illinois statute containing an irrebuttable presumption that unmarried fathers are incompetent to raise their children violated the Due Process Clause. Because of the statutory presumption, the State took custody of all illegitimate children upon the death of the mother, without allowing the father to attempt to prove his parental fitness. As the Court put the matter:

"It may be, as the State insists, that most unmarried fathers are unsuitable and neglectful parents. It may also be that Stanley is such a parent and that his children should be placed in other hands. But all unmarried fathers are not in this category; some are wholly suited to have custody of their children." *Id.,* at 654 (footnotes omitted).

Hence, we held that the State could not conclusively presume that any particular unmarried father was unfit to raise his child; the Due Process Clause required a more individualized determination. See also *United States Dept. of Agriculture* v. *Murry,* 413 U. S. 508; *id.,* at 514–517 (concurring opinion); *Bell* v. *Burson,* 402 U. S. 535; *Carrington* v. *Rash,* 380 U. S. 89.

These principles control our decision in the cases before us. While the medical experts in these cases differed on many points, they unanimously agreed on one—the ability of any particular pregnant woman to continue at work past any fixed time in her pregnancy is very much an individual matter.[12] Even assuming, *arguendo,* that

---

[12] There were three medical witnesses in the Cleveland case: Dr. Sarah Marcus and Dr. Veners Rutenbeigs (Mrs. Nelson's obstetrician), who testified on behalf of the respondents, and Dr. William C.

there are some women who would be physically unable to work past the particular cutoff dates embodied in the challenged rules, it is evident that there are large numbers of teachers who are fully capable of continuing work for longer than the Cleveland and Chesterfield County regulations will allow. Thus, the conclusive presumption embodied in these rules, like that in *Vlandis*, is neither "necessarily [nor] universally true," and is violative of the Due Process Clause.

The school boards have argued that the mandatory termination dates serve the interest of administrative convenience, since there are many instances of teacher pregnancy, and the rules obviate the necessity for case-by-case determinations. Certainly, the boards have an interest in devising prompt and efficient procedures to achieve their legitimate objectives in this area. But, as the Court stated in *Stanley* v. *Illinois, supra,* at 656:

"[T]he Constitution recognizes higher values than speed and efficiency. Indeed, one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy govern-

---

Weir, the petitioners' expert. While Dr. Weir generally disagreed with his colleagues on the potential effects of pregnancy on a teacher's job performance, he noted that each pregnancy was an individual matter, and should be prescribed for as such. Similarly, the two medical experts in the Chesterfield County case, Dr. Leo J. Dunn and Dr. David C. Forrest, testified that each particular pregnancy must be managed as an individual matter. Cf. R. Benson, Handbook of Obstetrics & Gynecology 109 (4th ed. 1971); Curran, Equal Protection of the Law: Pregnant School Teachers, 285 New England J. Medicine 336; Comment, Mandatory Maternity Leave of Absence Policies—An Equal Protection Analysis, 45 Temp. L. Q. 240, 245.

ment officials no less, and perhaps more, than mediocre ones." (Footnote omitted.)

While it might be easier for the school boards to conclusively presume that all pregnant women are unfit to teach past the fourth or fifth month or even the first month, of pregnancy, administrative convenience alone is insufficient to make valid what otherwise is a violation of due process of law.[13] The Fourteenth Amendment requires the school boards to employ alternative administrative means, which do not so broadly infringe upon basic constitutional liberty, in support of their legitimate goals.[14]

We conclude, therefore, that neither the necessity for continuity of instruction nor the state interest in keeping

---

[13] This is not to say that the only means for providing appropriate protection for the rights of pregnant teachers is an individualized determination in each case and in every circumstance. We are not dealing in these cases with maternity leave regulations requiring a termination of employment at some firm date during the last few weeks of pregnancy. We therefore have no occasion to decide whether such regulations might be justified by considerations not presented in these records—for example, widespread medical consensus about the "disabling" effect of pregnancy on a teacher's job performance during these latter days, or evidence showing that such firm cutoffs were the only reasonable method of avoiding the possibility of labor beginning while some teacher was in the classroom, or proof that adequate substitutes could not be procured without at least some minimal lead time and certainty as to the dates upon which their employment was to begin.

[14] The school boards have available to them reasonable alternative methods of keeping physically unfit teachers out of the classroom. For example, they could require the pregnant teacher to submit to medical examination by a school board physician, or simply require each teacher to submit a current certification from her obstetrician as to her ability to continue work. Indeed, when evaluating the physical ability of a teacher to *return* to work, each school board in this case relies upon precisely such procedures. See nn. 1 and 5, *supra;* see also text, *infra,* at 648–650.

physically unfit teachers out of the classroom can justify the sweeping mandatory leave regulations that the Cleveland and Chesterfield County School Boards have adopted. While the regulations no doubt represent a good-faith attempt to achieve a laudable goal, they cannot pass muster under the Due Process Clause of the Fourteenth Amendment, because they employ irrebuttable presumptions that unduly penalize a female teacher for deciding to bear a child.

## III

In addition to the mandatory termination provisions, both the Cleveland and Chesterfield County rules contain limitations upon a teacher's eligibility to return to work after giving birth. Again, the school boards offer two justifications for the return rules—continuity of instruction and the desire to be certain that the teacher is physically competent when she returns to work. As is the case with the leave provisions, the question is not whether the school board's goals are legitimate, but rather whether the particular means chosen to achieve those objectives unduly infringe upon the teacher's constitutional liberty.

Under the Cleveland rule, the teacher is not eligible to return to work until the beginning of the next regular school semester following the time when her child attains the age of three months. A doctor's certificate attesting to the teacher's health is required before return; an additional physical examination may be required at the option of the school board.

The respondents in No. 72–777 do not seriously challenge either the medical requirements of the Cleveland rule or the policy of limiting eligibility to return to the next semester following birth. The provisions concerning a medical certificate or supplemental physical examination are narrowly drawn methods of protecting the

school board's interest in teacher fitness; these requirements allow an individualized decision as to the teacher's condition, and thus avoid the pitfalls of the presumptions inherent in the leave rules. Similarly, the provision limiting eligibility to return to the semester following delivery is a precisely drawn means of serving the school board's interest in avoiding unnecessary changes in classroom personnel during any one school term.

The Cleveland rule, however, does not simply contain these reasonable medical and next-semester eligibility provisions. In addition, the school board requires the mother to wait until her child reaches the age of three months before the return rules begin to operate. The school board has offered no reasonable justification for this supplemental limitation, and we can perceive none. To the extent that the three-month provision reflects the school board's thinking that no mother is fit to return until that point in time, it suffers from the same constitutional deficiencies that plague the irrebuttable presumption in the termination rules.[15] The presumption, moreover, is patently unnecessary, since the requirement of a physician's certificate or a medical examination fully protects the school's interests in this

---

[15] It is clear that the factual hypothesis of such a presumption—that no mother is physically fit to return to work until her child reaches the age of three months—is neither necessarily nor universally true. See R. Benson, *supra*, n. 12, at 209 (patient may return to "full activity or employment" if course of progress up to fourth or fifth week is normal). Cf. Comment, Love's Labors Lost: New Conceptions of Maternity Leaves, 7 Harv. Civ. Rights-Civ. Lib. L. Rev., at 262 n. 11, 287 n. 145.

Of course, it may be that the Cleveland rule is based upon another theory—that new mothers are too busy with their children within the first three months to allow a return to work. Viewed in that light, the rule remains a conclusive presumption, whose underlying factual assumptions can hardly be said to be universally valid.

regard. And finally, the three-month provision simply has nothing to do with continuity of instruction, since the precise point at which the child will reach the relevant age will obviously occur at a different point throughout the school year for each teacher.

Thus, we conclude that the Cleveland return rule, insofar as it embodies the three-month age provision, is wholly arbitrary and irrational, and hence violates the Due Process Clause of the Fourteenth Amendment. The age limitation serves no legitimate state interest, and unnecessarily penalizes the female teacher for asserting her right to bear children.

We perceive no such constitutional infirmities in the Chesterfield County rule. In that school system, the teacher becomes eligible for re-employment upon submission of a medical certificate from her physician; return to work is guaranteed no later than the beginning of the next school year following the eligibility determination.[16] The medical certificate is both a reasonable and narrow method of protecting the school board's interest in teacher fitness, while the possible deferring of return until the next school year serves the goal of preserving continuity of instruction. In short, the Chesterfield County rule manages to serve the legitimate state interests here without employing unnecessary presumptions that broadly burden the exercise of protected constitutional liberty.

---

[16] The Virginia rule also requires that the teacher give assurance that care of the child will not unduly interfere with her job duties. While such a requirement has within it the potential for abuse, there is no evidence on this record that the assurance required here is anything more than that routinely sought by employers from prospective employees—that the worker is willing to devote full attention to job duties. Nor is there any evidence in this record that the school authorities do not routinely accept the woman's assurance of her ability to return.

## IV

For the reasons stated, we hold that the mandatory termination provisions of the Cleveland and Chesterfield County maternity regulations violate the Due Process Clause of the Fourteenth Amendment, because of their use of unwarranted conclusive presumptions that seriously burden the exercise of protected constitutional liberty. For similar reasons, we hold the three-month provision of the Cleveland return rule unconstitutional.

Accordingly, the judgment in No. 72–777 is affirmed; the judgment in No. 72–1129 is reversed, and the case is remanded to the Court of Appeals for the Fourth Circuit for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE DOUGLAS concurs in the result.

MR. JUSTICE POWELL, concurring in the result.

I concur in the Court's result, but I am unable to join its opinion. In my view these cases should not be decided on the ground that the mandatory maternity leave regulations impair any right to bear children or create an "irrebuttable presumption." It seems to me that equal protection analysis is the appropriate frame of reference.

These regulations undoubtedly add to the burdens of childbearing. But certainly not every government policy that burdens childbearing violates the Constitution. Limitations on the welfare benefits a family may receive that do not take into account the size of the family illustrate this point. See *Dandridge* v. *Williams,* 397 U. S. 471 (1970). Undoubtedly Congress could, as another example, constitutionally seek to discourage excessive population growth by limiting tax deductions for dependents. That would represent an

intentional governmental effort to "penalize" child-bearing. See *ante,* at 640. The regulations here do not have that purpose. Their deterrent impact is wholly incidental. If some intentional efforts to penalize childbearing are constitutional, and if *Dandridge, supra,* means what I think it does, then certainly these regulations are not invalid as an infringement of any right to procreate.

I am also troubled by the Court's return to the "irrebuttable presumption" line of analysis of *Stanley* v. *Illinois,* 405 U. S. 645 (1972) (POWELL, J., not participating), and *Vlandis* v. *Kline,* 412 U. S. 441 (1973). Although I joined the opinion of the Court in *Vlandis* and continue fully to support the result reached there, the present cases have caused me to re-examine the "irrebuttable presumption" rationale. This has led me to the conclusion that the Court should approach that doctrine with extreme care. There is much to what MR. JUSTICE REHNQUIST says in his dissenting opinion, *post,* at 660, about the implications of the doctrine for the traditional legislative power to operate by classification. As a matter of logic, it is difficult to see the terminus of the road upon which the Court has embarked under the banner of "irrebuttable presumptions." If the Court nevertheless uses "irrebuttable presumption" reasoning selectively, the concept at root often will be something else masquerading as a due process doctrine. That something else, of course, is the Equal Protection Clause.

These cases present precisely the kind of problem susceptible of treatment by classification. Most school teachers are women, a certain percentage of them are pregnant at any given time, and pregnancy is a normal biological function possessing, in the great majority of cases, a fairly well defined term. The constitutional difficulty is not that the boards attempted to deal with

this problem by classification. Rather, it is that the boards chose irrational classifications.

A range of possible school board goals emerge from the cases. Several may be put to one side. The records before us abound with proof that a principal purpose behind the adoption of the regulations was to keep visibly pregnant teachers out of the sight of schoolchildren.[1] The boards do not advance this today as a legitimate objective, yet its initial primacy casts a shadow over these cases. Moreover, most of the after-the-fact rationalizations proposed by these boards are unsupported in the records. The boards emphasize teacher absenteeism, classroom discipline, the safety of schoolchildren, and the safety of the expectant mother and her unborn child. No doubt these are legitimate concerns. But the boards have failed to demonstrate that these interests are in fact threatened by the continued employment of pregnant teachers.

To be sure, the boards have a legitimate and important interest in fostering continuity of teaching. And, even a normal pregnancy may at some point jeopardize that interest. But the classifications chosen by these boards, so far as we have been shown, are either counterproductive or irrationally overinclusive even with regard to this significant, nonillusory goal. Accordingly, in my opinion these regulations are invalid under rational-basis standards of equal protection review.[2]

---

[1] See, e. g., ante, at 641 n. 9.

[2] I do not reach the question whether sex-based classifications invoke strict judicial scrutiny, e. g., Frontiero v. Richardson, 411 U. S. 677 (1973), or whether these regulations involve sex classifications at all. Whether the challenged aspects of the regulations constitute sex classifications or disability classifications, they must at least rationally serve some legitimate articulated or obvious state interest. While there are indeed some legitimate state interests at stake here, it has not been shown that they are rationally furthered by the challenged portions of these regulations.

In speaking of continuity of teaching, the boards are referring in part to their valid interest in reducing the number of times a new teacher is assigned to a given class. It is particularly appropriate to avoid teacher turnover in the middle of a semester, since continuity in teaching approach, as well as teacher-pupil relationships, is otherwise impaired. That aspect of the Cleveland regulation limiting a teacher's eligibility to return to the classroom to the semester following delivery, which the Court approves, *ante,* at 649, rationally serves this legitimate state interest. But the four- and five-month prebirth leave periods of the two regulations and the three-month post-birth provision of the Cleveland regulation do not. As the Court points out, *ante,* at 642–643, such cutoff points are more likely to prevent continuity of teaching than to preserve it. Because the cutoff dates occur throughout the school year, they inevitably result in the removal of many capable teachers from the classroom in the middle or near the end of a semester, thus provoking the disruption the boards hope to avoid.

The boards' reference to continuity of teaching also encompasses their need to assure constant classroom coverage by teachers who are up to the task. This interest is obviously legitimate. No one disputes that a school board must concern itself with the physical and emotional capabilities of its teachers. But the objectionable portions of these regulations appear to be bottomed on factually unsupported assumptions about the ability of pregnant teachers to perform their jobs. The overwhelming weight of the medical testimony adduced in these cases is that most teachers undergoing normal pregnancies are quite capable of carrying out their responsibilities until some ill-defined point a short period prior to term. Certainly the boards have made little effort to contradict this conclusion. Thus, it appears that by forcing all pregnant teachers undergoing a normal

pregnancy from the classroom so far in advance of term, the regulations compel large numbers of able-bodied teachers to quit work.[3]   Once more, such policies inhibit, rather than further, the goal of continuity of teaching. For no apparent reason, they remove teachers from their students and require the use of substitutes.

The boards' reliance on the goal of continuity of teaching also takes into account their obvious planning needs. Boards must know when pregnant teachers will temporarily cease their teaching responsibilities, so that substitutes may be scheduled to fill the vacancies.   And, planning requires both notice of pregnancy and a fixed termination date.   It appears, however, that any termination date serves the purpose.[4]   The choice of a cutoff date that produces several months of forced unemployment is thus wholly unnecessary to the planning of the boards.   Certainly nothing in the records of these cases is to the contrary.

For the above reasons, I believe the linkage between the boards' legitimate ends and their chosen means is too attenuated to support those portions of the regulations overturned by the Court.   Thus, I concur in the Court's result.   But I think it important to emphasize the degree of latitude the Court, as I read it, has left the boards for dealing with the real and recurrent problems presented by teacher pregnancies.   Boards may demand in every case "substantial advance notice of

---

[3] Teachers who undergo abnormal pregnancies may well be disabled, either temporarily or for a substantial period. But as I read the Court, boards may deal with abnormal pregnancies like any other disability. *Ante,* at 642 n. 10.

[4] One may question, however, whether planning needs are well served by the mere two-week gap between notice and departure set forth in the Cleveland regulation. The brief notice the Cleveland board has allowed itself casts some doubt on that board's reliance on planning needs.

[pregnancy] . . . ." *Ante,* at 643. Subject to certain restrictions, they may require all pregnant teachers to cease teaching "at some firm date during the last few weeks of pregnancy. . . ." *Id.,* at 647 n. 13.[5] The Court further holds that boards may in all cases restrict re-entry into teaching to the outset of the school term following delivery. *Id.,* at 649.

In my opinion, such class-wide rules for pregnant teachers are constitutional under traditional equal protection standards.[6] School boards, confronted with sensitive and widely variable problems of public education, must be accorded latitude in the operation of school systems and in the adoption of rules and regulations of general application. *E. g., San Antonio Independent School District* v. *Rodriguez,* 411 U. S. 1, 42–43 (1973). A large measure of discretion is essential to the effective discharge of the duties vested in these local, often elective, governmental units. My concern with the Court's

---

[5] The Court's language does not specify a particular prebirth cutoff point, and we need not decide that issue, as these boards have attempted to support only four- and five-month dates. In light of the Court's language, however, I would think that a four-week prebirth period would be acceptable. I do not agree with the Court's view of the stringent standards a board must meet to justify a reasonable prebirth cutoff date. See *ante,* at 647 n. 13. Nothing in the Constitution mandates the heavy burden of justification the Court has imposed on the boards in this regard. If school boards must base their policies on a "widespread medical consensus . . . ," the "only reasonable method . . ." for accomplishing a goal, or a demonstration that needed services will otherwise be impossible to obtain, *ibid.,* they may be seriously handicapped in the performance of their duties.

[6] As the Court notes, these cases arose prior to the recent amendment extending Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.,* to state agencies and educational institutions. Pub. L. 92–261, 86 Stat. 103. See *ante,* at 639 n. 8. Like the Court, I do not address the impact of Title VII on mandatory maternity leave regulations.

opinion is that, if carried to logical extremes, the emphasis on individualized treatment is at war with this need for discretion. Indeed, stringent insistence on individualized treatment may be quite impractical in a large school district with thousands of teachers.

But despite my reservations as to the rationale of the majority, I nevertheless conclude that in these cases the gap between the legitimate interests of the boards and the particular means chosen to attain them is too wide. A restructuring generally along the lines indicated in the Court's opinion seems unavoidable. Accordingly, I concur in its result.

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE joins, dissenting.

The Court rests its invalidation of the school regulations involved in these cases on the Due Process Clause of the Fourteenth Amendment, rather than on any claim of sexual discrimination under the Equal Protection Clause of that Amendment. My Brother STEWART thereby enlists the Court in another quixotic engagement in his apparently unending war on irrebuttable presumptions. In these cases we are told that although a regulation "requiring a termination of employment at some firm date during the last few weeks of pregnancy," *ante,* at 647 n. 13, might pass muster, the regulations here challenged requiring termination at the end of the fourth or fifth month of pregnancy violate due process of law.

As THE CHIEF JUSTICE pointed out in his dissent last year in *Vlandis* v. *Kline,* 412 U. S. 441, "literally thousands of state statutes create classifications permanent in duration, which are less than perfect, as all legislative classifications are, and might be improved on by individualized determinations . . . ." *Id.,* at 462. Hundreds of years ago in England, before Parliament came to be thought of as a body having general lawmaking power,

controversies were determined on an individualized basis without benefit of any general law. Most students of government consider the shift from this sort of determination, made on an *ad hoc* basis by the King's representative, to a relatively uniform body of rules enacted by a body exercising legislative authority, to have been a significant step forward in the achievement of a civilized political society. It seems to me a little late in the day for this Court to weigh in against such an established consensus.

Countless state and federal statutes draw lines such as those drawn by the regulations here which, under the Court's analysis, might well prove to be arbitrary in individual cases. The District of Columbia Code, for example, draws lines with respect to age for several purposes. The Code requires that a person to be eligible to vote be 18 years of age,[1] that a male be 18 and a female be 16 before a valid marriage may be contracted,[2] that alcoholic beverages not be sold to a person under the age of 21 years,[3] or beer or light wines to any person under the age of 18 years.[4] A resident of the District of Columbia must be 16 years of age to obtain a permit to operate a motor vehicle,[5] and the District of Columbia delegate to the United States Congress must be 25 years old.[6] Nothing in the Court's opinion clearly demonstrates why its logic would not equally well sustain a challenge to these laws from a 17-year-old who insists that he is just as well informed for voting purposes as an 18-year-old, from a 20-year-old who insists that he is just as able to carry his liquor as a 21-year-old, or from the numerous other

---

[1] D. C. Code Ann. § 1–1102 (1973).

[2] *Id.,* § 30–103.

[3] *Id.,* § 25–121.

[4] *Ibid.*

[5] *Id.,* § 40–301.

[6] *Id.,* § 1–291 (b) (2).

persons who fall on the outside of lines drawn by these and similar statutes.

More closely in point is the jeopardy in which the Court's opinion places longstanding statutes providing for mandatory retirement of government employees. Title 5 U. S. C. § 8335 provides with respect to Civil Service employees:

> "(a) Except as otherwise provided by this section, an employee who becomes 70 years of age and completes 15 years of service shall be automatically separated from the service. . . ."

It was pointed out by my Brother STEWART only last year in his concurring opinion in *Roe* v. *Wade,* 410 U. S. 113, 168, that "the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment covers more than those freedoms explicitly named in the Bill of Rights. . . . Cf. . . . *Truax* v. *Raich,* 239 U. S. 33, 41." In *Truax* v. *Raich,* the Court said:

> "It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the Amendment to secure." 239 U. S. 33, 41 (1915).

Since this right to pursue an occupation is presumably on the same lofty footing as the right of choice in matters of family life, the Court will have to strain valiantly in order to avoid having today's opinion lead to the invalidation of mandatory retirement statutes for governmental employees. In that event federal, state, and local governmental bodies will be remitted to the task, thankless both for them and for the employees involved, of individual determinations of physical impairment and senility.

It has been said before, *Williamson* v. *Lee Optical Co.,* 348 U. S. 483 (1955), but it bears repeating here: All legislation involves the drawing of lines, and the drawing of lines necessarily results in particular individuals who are disadvantaged by the line drawn being virtually indistinguishable for many purposes from those individuals who benefit from the legislative classification. The Court's disenchantment with "irrebuttable presumptions," and its preference for "individualized determination," is in the last analysis nothing less than an attack upon the very notion of lawmaking itself.

The lines drawn by the school boards in the city of Cleveland and Chesterfield County in these cases require pregnant teachers to take forced leave at a stage of their pregnancy when medical evidence seems to suggest that a majority of them might well be able to continue teaching without any significant possibility of physical impairment. But, so far as I am aware, the medical evidence also suggests that in some cases there may be physical impairment at the stage of pregnancy fastened on by the regulations in question, and that the probability of physical impairment increases as the pregnancy advances. If legislative bodies are to be permitted to draw a general line anywhere short of the delivery room, I can find no judicial standard of measurement which says the ones drawn here were invalid. I therefore dissent.