**Ann MITCHELL, Appellant,**

v.

**BOARD OF TRUSTEES OF PICKENS COUNTY SCHOOL DISTRICT A, Appellee.**

**No. 77-2385.**

United States Court of Appeals, Fourth Circuit.

Argued Nov. 13, 1978.

Decided May 25, 1979.

---

8. Dr. Nelson actually diagnosed both pneumoconiosis *and* emphysema. See § III, *infra.*

Jerry D. Anker, Washington, D. C. (Steven E. Silverman, Wald, Harkrader & Ross, David Rubin, Washington D. C., T. Travis Medlock, Medlock & Davis, Columbia, S. C., on brief), for appellant.

Bruce E. Davis, Camden, S. C., for appellee.

Before HAYNSWORTH, Chief Judge, PHILLIPS, Circuit Judge and WALTER E. HOFFMAN, Senior District Judge, sitting by designation.

PHILLIPS, Circuit Judge:

This appeal presents the question whether a school board's policy that required a pregnant teacher to report her pregnancy to school officials immediately upon its discovery, and then used the disclosed pregnancy as the sole basis for declining to renew her contract for the succeeding school year violated § 703(a)(1) or (2) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1) and (2). The district court held, relying essentially on *General Electric Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), that it did not. In light of *Nashville Gas Co. v. Satty,* 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977) decided during the pendency of this appeal, we reverse and remand.

The instant case presents another classic illustration of the difficulty wryly observed by Mr. Justice Powell in *Satty* that has attended the best efforts of parties and courts to bring Title VII lawsuits to final resolution during a recent past characterized by a "meandering course" of adjudication in which both parties and lower courts have often "proceeded on what was ultimately an erroneous theory of the case." *Id.* at 148, 98 S.Ct. at 354 (Powell, J., concurring). Whatever the frustrations for both parties and courts during such a period of necessarily laborious working-out of important national policy through the judicial process, a patient faithfulness to the imperatives of that process binds us to the course. For reasons that will appear, this requires at least one more meander for this case before it may finally come to rest.

## I.

Ann Mitchell was a state-certified high school Spanish teacher in the Pickens County School District, South Carolina, for the school year 1971–72. There is full agreement that her work was of the highest quality. In February 1972, she signed a letter of intent relating to the renewal of her contract for the school year 1972–73. In April 1972, she discovered she was pregnant with anticipated delivery in November 1972. As required by the school district's regulations she gave notice of this fact to the school administration.[1] Thereafter, Mitchell made tentative arrangements to have a teacher serve as a substitute for the six weeks anticipated leave. This plan was disapproved by the Superintendent and as a result Mitchell's contract was not renewed. The Board of Trustees ultimately upheld the Superintendent's decision, applying an "unwritten policy" against renewing the contract of any teacher who at renewal time could not commit to a full-year's service.

In August 1972, Mitchell brought suit against school officials under § 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, alleging violation of her federal constitutional rights by the non-renewal of her contract. On April 4, 1973, the district court gave summary judgment for the school officials on the authority of this Court's then recent decision in *Cohen v. Chesterfield County School Board*, 474 F.2d 395 (4th Cir. 1973) (en banc), *rev'd sub nom. Cleveland*

*Board of Education v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974). Mitchell appealed that judgment to this Court and while the appeal was pending filed a second action stating essentially the same claim under Title VII. After the Supreme Court's *LaFleur* decision reversed this Court's decision in *Cohen*, we vacated the district court's decision in the § 1983 action and remanded for further proceedings. Upon remand the district court consolidated the two actions on the basis of an amended complaint stating both claims. After discovery, the case was submitted for decision by the court upon the pleadings, depositions, and various affidavits.

Relying essentially on this Court's then recent decision in *Gilbert v. General Electric Co.*, 519 F.2d 661 (4th Cir. 1975), *rev'd*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976); on *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); and on applicable EEOC guidelines, the district court made findings of fact from which it concluded that, although facially neutral, the Board's policies had the forbidden consequence, albeit unintended, of sex-related discrimination, and so violated *prima facie* Mitchell's rights under Title VII. Concluding also that the policies had not been shown "necessary to the normal operation of a school," the district court on January 22, 1976 entered judgment awarding back pay and attorney's fees to Mitchell.[2] Defendants filed notice of appeal from this judgment.

1. The teacher's Manual provided as follows:
   The principal of the school shall decide when the presence of a pregnant woman (teacher, student, or employee) is detrimental to the satisfactory operation of the school program. In all cases of maternity, women who are under contract with the Board of Trustees must in writing apply to the principal of the school or immediate superior official for termination of contract as soon as pregnancy is determined. This termination should take effect not less than three (3) months prior to expected delivery date. Exceptions must be approved by the District Superintendent.
   While the notification requirement critical to this regulation is literally related to "termination" of ongoing contracts rather than to "non-renewal" of contracts for succeeding years, the

duty to notify is literally addressed to any teacher "under contract" who determines she is pregnant. There is no question on the record of its intended application to Mitchell's determination and disclosure of her pregnancy; and of course both she and the board so acted upon it, with the results that gave rise to this litigation.
   This regulation was revoked by the school board during this litigation.

2. The court deliberately avoided ruling on the constitutional claim, and it has technically never been determined. Although plaintiff originally sought injunctive relief, back pay and reinstatement, and attorney's fees, she later abandoned all claims for relief except a declaration of violation of rights, back pay for only that portion of the fall semester outside the

Because the Supreme Court's decision in *Gilbert* was then pending, docketing of defendant's appeal was deferred.[3] When the Supreme Court then reversed this Court's decision in *Gilbert*, the district court on July 27, 1977 "withdrew" its then extant judgment and entered a new judgment for the school official defendants. Leaving its findings of fact intact, the district court construed the Supreme Court's *Gilbert* decision to require different conclusions of law leading to a complete reversal of its pre-*Gilbert* judgment. At this point the school official defendants of course withdrew their appeal, and plaintiff Mitchell filed the appeal now before us.

## II.

When the district court entered its original judgment for plaintiff on her Title VII claim, it correctly utilized the "disparate impact" analysis that originated in *Griggs* and had recently been applied by this Court in our *Gilbert* decision. Under this approach the court accurately identified the challenged policy; concluded that although facially neutral its consequences bore with disparate impact upon women; and held that not being shown "necessary to the normal operation of a school" it violated § 703(a)(1) and (2) of Title VII. The key to this analysis lay in the court's correct perception of the nature and scope of the policies under challenge.[4] As identified by the district court, the policy was that by which school board officials secured and used information provided them at contract renewal time that a teacher would likely experi-

ence during the ensuing school year an extended period of absence as a basis for declining to renew that teacher's contract. In assessing the consequential impact of this policy, the court had little direct evidence of specific applications. There was evidence from the school board that the policy had on several occasions been applied to deny renewal to persons who for various reasons unassociated with anticipated physical disability could not commit to full year employment.[5] Beyond these few instances, school officials testified that *if* they had been notified of any sorts of anticipated absences of extended duration comparable to those necessitated by pregnancy, these *would have been* treated comparably, but no specific instances were shown. On the other hand, the plaintiff could offer, in addition to her own case, only two other specific instances from the same school year in which advance notifications of pregnancy had resulted in non-renewal of contracts.[6] Thus the court was faced with a record in which the universe of persons potentially affected and those actually affected by the challenged policy did not permit the sort of reliable statistical proofs of actual consequences frequently available and useful in disparate impact cases. It had instead to proceed on the basis of the few specific applications of the policy proven, such inferences of likely other applications as these instances could rationally support, and judicial notice of the world as it is and as it is known in common experience to be. *See* Fed.R.Evid. 201.[7] On this record, the dis-

---

maternity leave period requested, court costs and attorney's fees.

**3.** And "relief" from the January 22, 1976 judgment was granted under Fed.R.Civ.P. 60(b)(6) pending the *Gilbert* decision. We note the practice without approving it.

**4.** That disparate impact analysis may well turn on the threshold identification of the nature and scope of the policy or practice being challenged, hence the "universe" of persons potentially and actually affected by it, *see General Electric Co. v. Gilbert*, 429 U.S. 125, 147–48, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976) (Brennan, J., dissenting).

**5.** *E. g.*, spouse taking employment necessitating family relocation. Such information apparently came by voluntary disclosure or upon specific inquiry. None was officially compelled.

**6.** And a school official concluded that he was "sure" there had been other cases.

**7.** Statistical proof of actual applications is not of course indispensable to proving the disparate impact *prima facie* case, particularly where, as here, the action is individual and not class. Circumstantial evidence, complemented by judicial notice to show that a facially neutral policy must in the ordinary course have a disparate impact on a protected group of which an

trict court rightly concluded that a policy that arguably would not renew the contract of any teacher who for any reason could not commit at contract renewal time to a full year's uninterrupted service, but that singled out pregnancy alone for compelled disclosure, would necessarily impact disproportionately upon women. Because, as the district court put it, "defendants' actions . . . resulted in the denial of a teaching job to plaintiff solely because of pregnancy," *Griggs'* teaching, as then recently applied by this Court in *Gilbert*, was thought to compel the conclusion that the policy's "consequences," as experienced by Mitchell, constituted a *prima facie* violation of her Title VII employment rights.

Then followed the Supreme Court's decision in *Gilbert* that held the exclusion of pregnancy from a generally comprehensive employee disability insurance program not violative of § 703(a)(1) of Title VII. Confronted with this decision, the district court then concluded that its earlier disparate impact analysis that had relied heavily on this Court's *Gilbert* decision had been undercut. Basically, the district court now read the Supreme Court's *Gilbert* opinion to mandate for all Title VII cases the stringent constitutional standards for proof of discrimination that it had applied in such constitutional claim cases as *Geduldig v. Aiello*, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), and that this Court had explicitly rejected for Title VII cases in our own *Gilbert* decision. On that premise the district court now concluded that "[i]n light of *Gilbert* and the statutory language it construed, the defendants' unwritten policy of the non-renewal of teacher contracts where a predicted period of absence is indicated, has not been shown to constitute gender-based discrimination or to be gender-based in effect."

*Nashville Gas Co. v. Satty*, 434 U.S. 136, 98 S.Ct. 347 (1977), decided during the pendency of this appeal, makes plain that, however understandably, the district court has read *Gilbert* too broadly, and that its first conclusion of a *prima facie* Title VII disparate impact violation was correct. *Satty*, holding violative of Title VII a facially neutral leave absence policy that without business necessity denied accumulated seniority to women on maternity leave while granting it for all other disability leaves, distinguished *Gilbert* on two major points. They also distinguish *Gilbert* from this case. Most importantly, the *Satty* Court pointed out that the *Gilbert* practice "merely refused to extend to women a benefit that men cannot and do not receive," while the *Satty* practice "imposed on women a substantial burden that men need not suffer." 434 U.S. at 142, 98 S.Ct. at 351. Furthermore, this distinction was said to be "more than one of semantics," *id.*, and to be based upon the application of different sections of Title VII in the two cases. While § 703(a)(1), the Title VII section invoked in *Gilbert*, had been there held not to require that "greater benefits be paid to one sex or the other 'because of their differing roles'" in "the scheme of human existence,'" this did not mean that § 703(a)(2), the Title VII section invoked in *Satty*, could be read to "permit an employer to burden female employees in such a way as to deprive them of employment opportunities because of their different role." *Id.*[8]

■ Within the *Satty* analysis, as applied to the facts found by the district court in this case and undisturbed in its judgment before us, the defendants' policy as applied clearly also imposed upon women school teachers a substantial burden that their male counterparts need not suffer. Women

---

individual plaintiff is a member is often utilized. *See, e. g., Nashville Gas Co. v. Satty*, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977). To require statistical proof involving a significant sample of actual applications of a policy to establish its disparate impact would always preclude the claim of a "first impactee." Title VII of course cannot be read to yield such a result.

8. That there is a critical distinction between the intended coverage and the proof requirements of § 703(a)(1) and (2) respectively was necessary to decision in *Satty*, where both a *Gilbert*-type exclusion of benefits and a *Griggs*-type imposition of burdens on a protected group by facially neutral policies were involved.

teachers alone were required by regulation to give advance notice of any anticipated absence of extended duration during an ensuing year. While it may be factually inferable that any male whose comparable anticipated absence was voluntarily disclosed either by himself or others would similarly have been denied renewal of contract, no official obligation of disclosure was laid upon men, and the record is devoid of evidence that anticipated absences for reasons of physical disability were ever used to deny renewal to men. The policies in combination clearly deprived women, including this plaintiff, of "employment opportunities"—renewal for another year— and "adversely affect[ed their] status as . . . employee[s]" "because of [their] sex" within the meaning of § 703(a)(2). The policy and its consequences in application are not only indistinguishable in substance from those held violative of § 703(a)(2) in *Satty*, but also from those found *prima facie* violative in *Pennington v. Lexington School District 2*, 578 F.2d 546 (4th Cir. 1978), another post-*Satty* decision of this Court.[9]

### III.

Finding a *prima facie* violation of § 703(a)(2) does not end the matter. It still

lies with a defendant found in *prima facie* violation of that section to escape liability by showing "business necessity" as justification for the challenged policy. *See Pennington v. Lexington School District 2, id.*

Unlike the *prima facie* violation that we have found established, this issue cannot be resolved on the present record. The defendants have pressed throughout this litigation a justification type defense, but it is at least questionable on the record before us whether either they or the district court have fully apprehended it as the "business necessity" defense that originated with the "disparate impact" theory of recovery under § 703(a)(2). Rather, the defendants from the outset have considered that plaintiff's Title VII claims were claims requiring proof of constitutionally proscribed discrimination and consequently were subject to the defense of a "legitimate state interest." This defense they have sought to show in the state's educational interest in continuity of instruction. While the record is not perfectly clear on the point, it appears most likely that the district court has similarly assessed the defendant's justification defense in these terms.[10] In gauging the requirements of fairness on remand it is important to recall that, except for the brief

**9.** In *Pennington*, the policies in question, although different in literal formulation and in thrust of application, came in the end to essentially the same thing as those in the instant case. In *Pennington* a pregnant teacher requested a 40-day maternity leave at the beginning of the next school year. This was denied on the basis of a written policy providing that, ordinarily, absences of 20 consecutive days' duration should be cause for termination, with reinstatement a matter of grace. The teacher was guaranteed instead reinstatement in the same or a comparable position no later than the first day of the school year following her certified physical fitness for full-time employment, and was in fact at that time reemployed teaching a different subject in which she was not as proficient. The evidence showed a consistent practice of reinstatement within the same year for other disabilities than pregnancy that led to absences of longer duration than 20 days.

**10.** As indicated earlier in this opinion, the district court's finding of non-justification that undergirded its later withdrawn judgment for plaintiff was stated in terms of a failure to

show that the challenged policy was "necessary to the normal operation of a school." In context, it seems apparent that this was in turn based upon the court's perception that plaintiff's arrangement for a substitute teacher completely met any necessity to provide continuity of instruction, this being the legitimate state educational interest advanced by the defendants as justification. While the "business necessity" defense might be thought completely subsumed within the "legitimate state educational interest" defense plainly advanced by defendants and rejected by the district court, they are enough different in concept that we are not disposed to hold on this record that failure of proof of the latter necessarily precludes proof of the former. *Compare Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 650, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) (legitimate state interest) *with Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) *and Robinson v. Lorillard Corp.*, 444 F.2d 791, 797–99 (4th Cir. 1971) (business necessity).

interlude when plaintiff held the upper hand in district court prior to the Supreme Court's decision in *Gilbert,* defendants' view of the appropriate theory of this defense has been vindicated by the course of procedural developments in which this view has never been directly rejected by any court until this opinion.[11] We must concede that plaintiff might understandably and accurately complain that she has never been under any misapprehension about the correct theory of claim and defense for her § 703(a)(2) claim[12] and that defendants' failure to have perceived what she has perceived should yield the ordinary litigation result of waiver of the defense. However, given the course of Title VII doctrinal developments while this case has proceeded, we do not think it would be fair to foreclose defendants from presenting in the district court such business necessity defense as they may have now that the course of adjudication has revealed it as the appropriate justification defense. *See Nashville Gas Co. v. Satty,* 434 U.S. 136, 150–52, 98 S.Ct. 347 (1977) (Powell, J., concurring). Accordingly, as we did in *Pennington,* we remand for consideration of any business necessity defense that defendants may be disposed and able to present on the existing or a reopened record. If this defense is not established, judgment should be entered for plaintiff on the basis of the *prima facie* violation found on this appeal.[13]

*REVERSED AND REMANDED.*

11. Plaintiff's first claim, on which defendants were the prevailing parties until *LaFleur* necessitated our remand, was a constitutional claim for which the state interest defense was indisputably the appropriate one. Subsequent litigation was entirely upon the Title VII claim added in the interim. On this, the plaintiff was briefly the prevailing party, but on the authority of our *Gilbert* decision later reversed. It was during this interval that the district court's finding of "non-necessity to the operation of a school" was in effect. Defendants never had a chance to challenge on appeal that finding of the district court because of the withdrawal of the judgment following the Supreme Court's reversal in *Gilbert.* From that point until this opinion was filed, the defense has not been in issue because the defendants have been the prevailing parties on a finding of no *prima facie* violation.

12. Plaintiff's brief on this appeal maintained its consistent position that the Title VII claim can only be defeated by a showing of *Griggs*-type business necessity, and argued that on the facts of record defendants have failed to make the requisite showing. Defendants continued to rely in terms upon the legitimate state interest theory.

13. Unless there are reasons not apparent of record, such a judgment would presumably include the award given in the withdrawn judgment of January 22, 1976, with such adjustment in costs and attorney's fees as the district court determines.