**Jodie ST. JOHN, Plaintiff,**

v.

**G. W. MURPHY INDUSTRIES, INC., et al., Defendants,**

**and**

**Duff-Norton Company, Inc., Additional-Defendant.**

**Civ. A. No. C–C–73–233.**

United States District Court,
W. D. North Carolina,
Charlotte Division.

Jan. 28, 1976.

---

Jonathan Wallas, Chambers, Stein, Ferguson & Becton, Charlotte, N. C., for plaintiff; Robert Belton, Nashville, Tenn., of counsel.

Michael P. Mullins, Mullins & Carson, Charlotte, N. C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

McMILLAN, District Judge.

This action was tried on December 15, 1975, upon allegations of the plaintiff that the defendants had engaged in policies and practices in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Specifically, the plaintiff claimed that she had been denied employment opportunities as a result of the practices of the defendants which discriminated against her on account of her sex. In addition, the plaintiff asserted that the defendants had denied her employment opportunities because the plaintiff had opposed employment practices of the defendants which she thought violated Title VII. The plaintiff seeks injunctive relief, in-

cluding equitable back pay, to remedy the claimed discrimination. Based upon the evidence, the Court enters the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Plaintiff, Jodie St. John, is a female citizen of the United States and the State of North Carolina residing in Mecklenburg County, North Carolina.

2. Defendant, G. W. Murphy Industries, Inc., is a corporation doing business in Mecklenburg County, North Carolina. Defendant, Duff-Norton Company, Inc., is a Delaware corporation doing business in Mecklenburg County, North Carolina.

3. The corporate defendants have operated manufacturing facilities located at 322 Atando Avenue, Charlotte, North Carolina, during periods pertinent to this action. While ownership of the Atando Avenue facilities has changed on several occasions since 1967, the facility has remained a large precision type machine shop operation in which machine parts are cast and refined from metals.

At various times, the Atando Avenue facilities have been known as Perfecting Service Division (of) Reed Tool Company, Perfecting Service Division (of) G. W. Murphy Industries, Inc., Reed Tool Company, and Duff-Norton Company, Inc. At the time of trial, Duff-Norton owned and operated the pertinent manufacturing facilities.

There are no contentions raised in this action about misjoinder or nonjoinder of parties. For the purposes of this action the corporate defendants can be treated as one and will hereinafter be referred to as the "Company" or the "defendant".

4. The Company has maintained a collective bargaining agreement with the United Steelworkers of America since October, 1967. The Steelworkers were originally a defendant in this case, but, prior to trial, this action was dismissed against the union on jurisdictional grounds.

5. The plaintiff was employed by the Company on or about April 25, 1967, to

work in the shipping and receiving department. Her duties included picking and wrapping parts to be shipped by the Company to its customers.

6. The plaintiff worked for the Company from April, 1967, to February, 1969. During this time, she consistently received good evaluations from her supervisors with respect to the quality of her work. Her work performance was rated "Good" on all nine periodic supervisory evaluations she received during her employment. She was periodically given raises and reached the top production rate for employees in her job classification. Her production efficiency (quantity of work) was often rated between 99.9% and 115%. The only serious criticism of plaintiff's work performance made by her supervisors during the period of April, 1967, to February, 1969, or by the defendant at trial was that her attendance (the complaint was primarily her tardiness) was sometimes not as good as it should have been. However, the nine supervisory evaluations she received during her employment with the defendant, the plaintiff's attendance was rated "good" five times, "fair" two times and "poor" two times. In the last evaluation she received before the termination of her employment in February, 1969, she received a "good" attendance rating.

7. The pertinent collective bargaining agreement and the practice of the Company allowed the Company to issue warning letters and letters of suspension if an employee's attendance proved unsatisfactory. Letters of warning and suspension have been issued by the Company to a number of employees; however, the plaintiff never received any such letters and was never suspended for any reason.

8. As of February, 14, 1969, the plaintiff was an employee of the Company in good standing.

9. During all times pertinent to this case, the plaintiff was married. In December, 1968, the plaintiff learned that she was pregnant. She had had complications with previous pregnancies and had three miscarriages prior to December, 1968.

10. In early January, 1969, the plaintiff informed her supervisor, Robert Boratea, that she was pregnant. Boratea instructed her to provide him with a letter from her doctor confirming the pregnancy. On or about January 10, 1969, the plaintiff's doctor, Dr. Leslie McLeod, wrote a letter confirming the plaintiff's pregnancy which was forwarded to Boratea by the plaintiff. McLeod, in the January 10 letter, estimated that the plaintiff's date of delivery would be July 22, 1969.

11. On or about February 14, 1969, the plaintiff asked her supervisor at that time, Virgil Perry, that she be allowed to take a week of accrued vacation beginning Monday, February 17, 1969. Perry granted the plaintiff permission to take this vacation. An appropriate form indicating that the plaintiff would be taking vacation after February 14, 1969, was prepared, executed and filed by Perry. The plaintiff worked on February 14, 1969, but did not go to work on February 17, 1969, because of her vacation. On February 18, 1969, the plaintiff went to Dr. McLeod's office for a scheduled appointment. At that time, the plaintiff, who had been passing blood clots, was advised by McLeod, who was familiar with her previous miscarriages, that it would be best for her not to work until after the baby she was carrying was delivered.

12. Subsequent to her office visit with Dr. McLeod, the plaintiff, on February 18, 1969, telephoned Mr. Glenn Youngblood who was at that time the Company's Personnel Director. The plaintiff informed Youngblood what Dr. McLeod had advised her and requested a leave of absence from the Company until she could return to work after her baby was born. Youngblood told the plaintiff that the Company did not give leaves of absence for pregnancy. He stated to her that if she would come back to him after her baby was born, he would put her back to work with the Company. Youngblood also requested that the

plaintiff have her doctor send to him a letter confirming she had been advised to stop working until after her baby's birth.[1] Subsequently, the plaintiff asked Dr. McLeod to write Youngblood. On February 25, 1969, Dr. McLeod sent a letter addressed to Youngblood which stated as follows:

Mr. Youngblood
Personnel Director
G. W. Murphy Industries
332 Atando Avenue
Charlotte, North Carolina
Re: Mrs. James Harold St. John (Joddie)

Dear Mr. Youngblood:

After reviewing the obstetrical history of this patient and talking with her about the type of work that she has been doing, I believe that it would be the safest thing that she not work during this pregnancy. If I can be of any further assistance, please let us hear from you.

Very truly yours,

W. L. McLeod, M. D.

13. On or about March 10, 1969, an Employee Termination form was executed by Youngblood and by C. S. Smith, Jr. and W. F. Round, two other Company officials. The form indicated the plaintiff had resigned for maternity reasons. In fact, the plaintiff had never submitted any resignation, written or otherwise. She had not returned to work after her scheduled week of vacation in February because of her doctor's advice and because Youngblood had told her that, although leaves of absence were not granted for pregnancies, the

Company would re-employ the plaintiff after her baby was born.

14. Article 23 of the Collective Bargaining Agreement maintained by the defendant and the Steelworkers as of February, 1969, provides, in pertinent part, as follows:

### ARTICLE XXIII
### LEAVES OF ABSENCES

A. Leave of absence shall be granted by the Company to employees because of physical disability resulting from an injury on duty for the period for which statutory compensation is payable but is not to exceed the termination of such disability as certified by a regularly licensed physician or the time of acceptance of employment elsewhere without first requesting employment with the Company and providing such leave or extension shall not exceed four (4) years.

B. Leave of absence shall be granted by the Company to employees because of physical disability resulting from causes other than injury on duty for the period of such disability, providing that prompt notice of such disability is given in writing to the Company, providing that prompt notice of such disability is supported by a regularly licensed physicians certificate and/or the Company's physicians certificate specifically stating the employee's disability to work during such period and providing such leave or extension thereof shall not exceed one (1) year for an employee with less than one (1) years

---

1. There was direct conflict between the testimony of the plaintiff and that of Youngblood regarding the February 18, 1969, conversation. Youngblood testified that he never told the plaintiff that the Company did not give pregnancy leaves. He stated he had talked to the plaintiff sometime prior to February, 1969, at which time the plaintiff informed him she was planning to resign from the Company to have her baby. The plaintiff in her testimony denied that she had said she wanted to resign. She testified she never resigned.

The Court concludes the plaintiff's version of the facts as found above is reasonable, corroborated and credible. This judgment is based on the entire circumstances and record including trial testimony, depositions, documentary evidence and upon judgments as to credibility, consistency, opportunity and occasion for accurate recall, and upon other such factors.

service or two (2) years for an employee with more than one (1) years service.

C. Leave of absence for other or personal reasons may be granted by and the discretion of the Company upon written request made by the employee and upon the securing of written approval by the Company prior to the leave. Such leaves shall depend in each case upon the reason for such leave and the need for the employee's uninterrupted service. Such leaves may be given for periods of from eight (8) to thirty (30) calendar days and such leaves or extension thereof are not to exceed ninety (90) calendar days in any one (1) year. An employee denied leave of absence under this provision may, upon request, have such request received by the Plant Manager.

15. In August, 1968, the plaintiff requested and received a leave of absence for personal reasons. At that time, her foreman, Robert Boratea, informed the plaintiff that she would need to file a leave of absence request in writing if she desired to obtain a leave of absence. Pursuant to his instructions, she prepared a written leave of absence request, and the request was granted.

16. In February, 1969, when the plaintiff requested a leave of absence from Youngblood, she was not informed that she would need to file a leave of absence request in writing. Rather, she was told by Mr. Youngblood that it would be impossible for her to obtain a leave of absence for pregnancy. The plaintiff testified and the Court finds that the plaintiff would have filed a written request for a leave of absence in February, 1969, if she had been so instructed. As of February, 1969, the plaintiff was not familiar with the provisions of the applicable collective bargaining agreement. In any event, she legitimately relied upon Personnel Director Youngblood's statement that she could not obtain a leave of absence for pregnancy related reasons and that she would be put to work after her baby was born.

17. The plaintiff did not work for the Company after February 14, 1969. A healthy baby was born to her in July, 1969.

18. On September 3, 1969, the plaintiff, having that day received clearance from Dr. McLeod to return to work, telephoned Mr. Youngblood and informed him that she was ready to go back to work. Youngblood informed her that there were no jobs available for the plaintiff and that she had not received any type of leave of absence or any guarantee of reemployment after her baby's birth.

19. The plaintiff went to the Company's Personnel Office on several occasions in September, 1969, and thereafter seeking employment. She was told on several occasions by Company personnel that work was unavailable and that she was not eligible for reemployment. Although she did not fill out a formal application in the Fall of 1969, it is clear that the plaintiff desired employment, that Company officials knew she wanted to return to work, and that the Company would not rehire her.

20. The parties have stipulated and the Court finds that there were jobs available at the Company from time-to-time after September, 1969, for which the plaintiff was qualified and for which people "off the street" were hired.

21. When the plaintiff learned she would not be employed in spite of Youngblood's promise made in February, 1969, to reemploy her, she, on advice from fellow employees, filed a grievance pursuant to the applicable collective bargaining agreement. The grievance was eventually denied after a hearing on November 18, 1969, because the plaintiff had not requested the leave of absence in writing.

22. At the grievance hearing held on November 18, 1969, the plaintiff talked to Danny Fox, a male union shop steward. Fox informed the plaintiff that he had developed a hernia sometime in July,

1968, and had been forced to go to the hospital. Subsequently, Youngblood had brought to Fox at the hospital a leave of absence form to be signed by him. Fox was on leave from July 28, 1968, to September 8, 1968. At the November grievance hearing the plaintiff protested what she felt to be the discriminatory treatment she had received from the Company. She stated, in effect, that Fox had been given preferable treatment since a leave of absence form had been brought to him in the hospital while she had been told she could not get a leave of absence for pregnancy but was now being penalized for not requesting a leave in writing. Youngblood was present at the November 18, 1969, grievance hearing at the time plaintiff protested the differing treatment afforded Fox.

23. On or about December 6, 1969, the plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission alleging sex discrimination against the Company and complaining specifically that the Company had denied her a leave of absence in February, 1969, and that the Company had given preferential treatment to Fox. Several times after December, 1969, the plaintiff returned to the Company to seek employment. She was never offered a job. On or about June 30, 1971, the plaintiff amended her December, 1969, EEOC charge and added the Steelworkers as alleged discriminators. On June 5, 1972, and again on November 19, 1973, the plaintiff filed additional EEOC charges against the Company and the Steelworkers alleging discrimination against her because she opposed practices made unlawful by Title VII.[2]

24. Notice of the filing of the plaintiff's first EEOC charge was not formally served on the Company until July, 1971. There is no evidence that the Company knew of the pendency of that EEOC charge prior to the actual time of this service.

25. The Court finds as a fact that the plaintiff was denied a leave of absence in February, 1969, solely because her leave request was occasioned by physical difficulties she was suffering as a result of her pregnancy. There is conflicting evidence as to what the Company's pregnancy leave policy was prior to February, 1969.[3] On October 15, 1969, Youngblood, in the Company's written answer to plaintiff's union grievance, stated that "no leave of Absence has been granted for maternity reasons since the inception of the Contract". In his deposition, Youngblood could not recall what the Company's pregnancy leave policy was prior to October, 1967 (the date the collective bargaining agreement first took effect).[4] In 1961, a Company employee, Marlene Bradshaw, was informed that the Company did not grant leaves for pregnancy. At the trial Youngblood testified that a pregnancy leave was given to Pearline Bailey, and two other women. The weight of the evidence tends to indicate the Company generally did not grant pregnancy leaves prior to February, 1969. However, regardless of the Company's general pregnancy leave policy prior to 1969, the Court finds the plaintiff was denied a leave of absence in February, 1969, only because her request involved leave necessitated by complications of her pregnancy.

26. The Company asserted at trial that plaintiff was not re-employed in

---

**2.** Prior to the institution of this action, a "Right to Sue" letter was issued to the plaintiff by the EEOC; this lawsuit was then timely filed. A second "Right to Sue" letter was issued in June, 1975, and the Complaint was appropriately amended.

**3.** It is clear that as of February, 1969, the Company did require pregnant employees to leave the Company at their sixth month of pregnancy. This policy, which has apparently

since been changed, would appear to be a violation of Title VII. See, *Cleveland Board of Education v. La Fleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1973).

**4.** In his deposition, Youngblood stated that the Company's leave of absence policies prior to October, 1967, were contained in its Shop Rules; however, those rules did not set forth any leave of absence guidelines.

September, 1969, and thereafter because of her alleged previous poor attendance problem. As stated above, the plaintiff was an employee of the Company in good standing when she went on vacation on February 14, 1969. She had never received any warning letters or suspensions for any reason. In contrast, a number of employees (e. g., W. T. Guinn, C. M. Weddington, W. B. Ford, Eric Pigg, Roosevelt Rorie, J. P. Carter, M. S. Tomberlin, H. A. Scercy, V. R. Perry, C. Allison) who worked for the defendant both before and after February, 1969, had attendance records considerably inferior to that of the plaintiff. These employees had received warning letters and suspensions because of their attendance. None had been terminated (or denied a leave of absence) because of their poor absentee records.

One Company employee, Eddie Hall, a male machinist, was terminated in August, 1971, when he refused to work on a Saturday. Prior to the day he refused to work, Hall had received at least one "poor" attendance rating from his supervisor and had been criticized on at least three evaluation forms because of his attendance deficiencies. Despite his prior attendance record, Hall was rehired by the Company on April 30, 1973.

27. The Court does not find that the plaintiff was the victim of retaliation by the Company. While the defendant did refuse to grant plaintiff a leave of absence solely because her request involved a pregnancy leave, the refusal to employ the plaintiff in September, 1969, and thereafter does not, on this record, demonstrate discrimination against the plaintiff because she opposed sex discrimination.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this action pursuant to Section 706(f) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(f). The defendants, G. W. Murphy Industries, Inc., and Duff-Norton Company, Inc., are employers engaged in industry affecting commerce within the meaning of Section 701(b) of Title VII, 42 U.S.C. § 2000e(b).

2. The plaintiff has satisfied all procedural requirements of Title VII; the Court has jurisdiction of this action; and this case is properly and timely brought in this Court. 42 U.S.C. § 2000e–5.

3. The legislative purpose behind Title VII is to protect employees from any form of disparate treatment because of, inter alia, sex; that is, "to make employment decisions sex blind, as well as colorblind." *Gilbert v. General Electric Co.*, 519 F.2d 661, 663 (4th Cir.), *cert. granted* 423 U.S. 822, 96 S.Ct. 36, 46 L.Ed.2d 39 (1975). The refusal of the defendant to grant the plaintiff a leave of absence solely because her leave request was necessitated by complications caused by pregnancy violates Title VII. *Wetzel v. Liberty Mutual Insurance Co.*, 511 F.2d 199, 207 (3rd Cir.), *vacated on other grounds* —— U.S. ——, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976). An employer cannot under Title VII deny "fringe benefits" to women, when it makes them available to men. A leave of absence policy which allows for leaves generally, but denies leaves necessitated by pregnancy, results in a less comprehensive program of employee compensation and benefits for women and violates Title VII. *Gilbert v. General Electric Co., supra,* at 664.

5. The refusal of the defendant to grant the plaintiff a leave of absence in February, 1969, and to employ the plaintiff in September, 1969, and thereafter was not justified by business necessity, *Robinson v. Lorillard Corp.*, 444 F.2d 791 (4th Cir. 1971), *cert. dism.* 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971), 404 U.S. 1007, 92 S.Ct. 651, 30 L.Ed.2d 655 (1972), or by any appropriate "objective criteria," *East v. Romine, Inc.*, 518 F.2d 332 (5th Cir. 1975), and was a violation of Title VII. Defendant argued that its decision not to re-employ plaintiff was based upon plaintiff's attendance record. But this argument assumes that plaintiff had rightfully been terminated, and not given a leave of absence, and it is the

failure to grant the leave that is the subject of this suit. Absenteeism was not used to justify the decision not to grant the leave.

6. The plaintiff is entitled to be made whole for any losses suffered as a result of the defendants' discriminatory actions. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

The plaintiff has suffered economic loss as a result of the refusal of the defendant to grant her a leave of absence and to employ her in September, 1969, and thereafter. Therefore, plaintiff is entitled to back pay from the defendant, and there are no special circumstances in this case that would render unjust an award of back pay. See, *Albemarle Paper Company v. Moody, supra; Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 253–254 (5th Cir. 1974).

7. Plaintiff, as the prevailing party herein, is entitled to recover her costs including reasonable attorney's fees, court costs, and expenses. *Lea v. Cone Mills Corp.,* 438 F.2d 86 (4th Cir. 1971); *Robinson v. Lorillard Corp., supra.*

## JUDGMENT

Based on the Findings of Facts and Conclusions of Law previously filed in this action, it is hereby ordered, adjudged and decreed:

1. That the defendants, G. W. Murphy Industries, Inc. (Perfecting Service Division, Reed Tool Co.) and Duff-Norton Company, Inc. (hereafter referred to as the "defendants" or the "Company") are hereby enjoined from discriminating against the plaintiff, Jodie St. John, because of the sex of the plaintiff.

2. That the Company offer to the plaintiff, in writing, the next vacancy for which the plaintiff is qualified which occurs at the Company's Charlotte, North Carolina facilities located on Atando Avenue. Said offer of reinstatement shall include an offer to reinstate the plaintiff's seniority with the Company with a seniority date of April 25, 1967, for all purposes.

3. That the plaintiff be and hereby is awarded back pay against the defendants for the period from September 3, 1969, up to and including the date she is reinstated with the Company or refuses a written offer of reinstatement.

4. That the back pay award is to be a sum which is the difference, computed on a quarterly basis from September 3, 1969, to the reinstatement of the plaintiff, between what the plaintiff would have earned in the job she held with the Company as of February, 1969, and what she actually earned or could have earned during said period with reasonable diligence.

5. That interest in the amount of 6% per annum be and is hereby allowed on the accrued back pay.

6. That the plaintiff be and is hereby awarded her costs in this action including reasonable counsel fees, court costs and expenses.

7. Counsel for the parties are directed to meet and confer within thirty (30) days of the entry of this Order for the purpose of fixing or agreeing upon the amount to be awarded as back pay pursuant to the formula set out herein. Absent an agreement by the parties, the parties are ordered to exchange pertinent documents and records relevant to the fixing of a dollar amount back pay award and to submit their respective positions concerning computation of back pay to the Court within forty-five (45) days of the entry of this Order. The Court will thereafter enter an Order fixing the dollar amount of the back pay award.

8. Counsel for the parties are also directed to meet and confer within thirty (30) days of the entry of this Order for the purpose of agreeing upon costs, attorney's fees and expenses. Absent such an agreement, (1) counsel for the plaintiff is directed to file with the Court a statement of time for which attorney's fees are claimed and an itemization of costs and expenses and, (2) the defendants are directed to file a statement with the Court setting forth the basis on

which they have compensated their counsel and the dollar amount they have paid or expect to pay their counsel in this action. If counsel are unable to agree on costs, attorney's fees and expenses the respective statements required herein shall be filed within forty-five (45) days of the entry of this Order.