Judith GURMANKIN, on behalf of herself and all others similarly situated

v.

Matthew COSTANZO, Superintendent of the School District of Philadelphia, et al.

Civ. A. No. 74–2980.

United States District Court, E. D. Pennsylvania.

April 2, 1976.

Jonathan M. Stein, Community Legal Services, Philadelphia, Pa., for plaintiffs.

Roberta L. Griffin, Philadelphia, Pa., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWCOMER, District Judge.

The plaintiff is a blind woman who brought this action on behalf of herself and a class of visually handicapped individuals qualified to teach in the public schools of Philadelphia. The plaintiff alleged that the hiring practices of the School District of Philadelphia discriminated against visually handicapped teachers in violation of the equal protection clause and the due process clause of the United States Constitution. The plaintiff also alleged violations of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and claimed that these violations were unconstitutional under the Civil Rights Act of 1871, 42 U.S.C. § 1983.

Upon consent of the parties, a consolidated preliminary and final injunction hearing was held in July, 1975, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. The Court reserved

making a decision on plaintiff's motion for determination of a class pending resolution of the named plaintiff's request for injunctive relief.

The court makes the following Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure:

## FINDINGS OF FACT

1. Plaintiff Judith Gurmankin is 31 years old and went blind at age 12. She attended Overbrook School for the Blind and then became the first blind student to attend Northeast High School in Philadelphia, where she graduated in the top one-fifth of her class in June, 1962.

2. Ms. Gurmankin has always wanted to be a teacher. After completing high school she enrolled in Temple University, majored in English, and received her Bachelor of Science degree in Education in June, 1968. She then obtained a Professional Certificate from the Pennsylvania Department of Education to teach Comprehensive English in Pennsylvania Public Schools. The plaintiff also has earned twenty-four hours of graduate credits at Temple University toward a master's degree in special education, and was graduated from Gratz College where she qualified and received a license to teach Jewish history and religion.

3. Ms. Gurmankin has done part-time teaching of Jewish history and religion at Keneseth Israel Hebrew School, Elkins Park, and also has taught part-time at the Oxford Circle Jewish Community Center. She has been a substitute teacher at Cheltenham High School, outside Philadelphia.

4. In 1966 while Ms. Gurmankin was attending Temple University, she met with Dr. Martin Ferrier, the Philadelphia School District's Personnel Director. Dr. Ferrier told her that she would be unable to obtain employment as a secondary school English teacher in the Philadelphia School District because the medical division normally would restrict blind applicants to service in schools and classes for blind and partially sighted students.

5. Sometime between 1967 and 1968 Ms. Gurmankin was a student teacher at the Logan School. The Logan School is a public elementary school in the School District which functions both as a neighborhood school for about 500 children and as a citywide center for about 175 visually handicapped children. After the eighth grade visually handicapped students are placed in regular schools.

6. Ms. Gurmankin did not complete her student teaching at the Logan School. She withdrew from the program apparently because she wanted to teach sighted students and she did not believe that remaining at Logan School would help her reach that goal.

7. While student teaching at Logan School Ms. Gurmankin had many of the same problems encountered by most student teachers, including keeping up to date with lesson planning, having materials prepared on time, and maintaining a good relationship with her supervising teacher. Ms. Gurmankin testified that she was not highly motivated to teach visually handicapped students. She thought she could help the blind more by being with sighted persons who needed to learn more about the blind.

8. Ms. Gurmankin was unable to obtain a position for student teaching sighted students in a Philadelphia public secondary school. Consequently, she did her student teaching at Schwenksville High School.

9. At Schwenksville, Ms. Gurmankin student taught five high school English classes for eight weeks. She used the blackboard and various equipment such as a record player and a tape recorder, gave examinations, taught Shakespeare from a Braille text, and had no problems getting around the building after the first week. While the students apparently showed enthusiasm for Ms. Gurmankin's teaching, her supervising teacher, Mrs. Rebecca Price, made the following evaluation of her teaching performance: "Without the period to period assistance of Mr. Omasko [the master teacher at Schwenksville], the student aides who aided and worked and many

others who helped and assisted this student teaching experience would never have met with the minimal success that it did." Most of this assistance was given to Ms. Gurmankin between classes or during her free periods.

10. In 1969, Ms. Gurmankin again met with defendant Dr. Martin Ferrier to inquire about employment opportunities. She was examined by the School District's Director of Medical Services but was rejected for any position teaching sighted pupils because of her blindness.

11. The medical and personnel policy of the Philadelphia School District until 1974 was to exclude blind teachers from teaching sighted students in public schools. Applicants who were certified as having a "chronic or acute physical defect," administered as including the blind, were prevented from taking the teacher's examination.

12. In 1971 or 1972 Ms. Gurmankin met with School Superintendent Matthew Costanzo and reiterated her desire to teach in the Philadelphia School District.

13. In 1973, Ms. Gurmankin was examined again by the Division of Health Services and was accepted as a substitute teacher.

14. In the fall of 1973, with the assistance of counsel at Community Legal Services, Inc., Ms. Gurmankin made contact with Mrs. Tobyann Boonin, a member of the School Board. Mrs. Boonin arranged for Ms. Gurmankin to take the written and oral parts of the examination for secondary school English teachers.

15. Ms. Gurmankin took the examination in the spring of 1974. Her score on the written examination was 82, which placed her 56th among the 164 written examinations graded. The average score on the written examination was 74.15, and the median score was 77. On the oral examination, Ms. Gurmankin's score was 72, only slightly above the minimum passing grade of 70. In addition, 106 of the teachers taking the same examination had score points added to their combined written and oral test scores. There score points are awarded for prior student teaching within Philadelphia public schools. For the 106 applicants that had student taught in Philadelphia, the average number of score points awarded was 6.4. Since Ms. Gurmankin had done her student teaching in Schwenksville, not Philadelphia, she received no score points.

16. Between 1969 when Ms. Gurmankin obtained her certificate to teach from the Pennsylvania Department of Education until 1974, 958 secondary school English teachers were hired by the School District of Philadelphia. By July 17, 1975, 92 additional teachers were hired from the 1974 examination.

17. The Philadelphia School District has no blind teachers teaching sighted students. Any visually handicapped teachers employed by the school district teach only visually handicapped children at the Logan School. Three such teachers were employed at Logan School in 1975.

18. At a national level, almost no blind teachers were employed in public schools prior to 1960. At the present time, there are over 400 such teachers, although many of these are in states such as California and New York which adopted anti-discrimination laws in the 1960's.

19. The Blind are a very small minority in our society. Pennsylvania's Bureau of the Visually Handicapped finds two legally blind per 1000 persons and 5 visually handicapped per 1000 persons.

20. The blind undoubtedly are treated differently than the sighted in various areas, such as employment. Several of plaintiff's expert witnesses testified that unequal treatment accorded the blind is the result of misconceptions and myths held by sighted persons about the blind. Sighted persons may make erroneous assumptions of the abilities of blind persons. Legislative bodies recently have recognized that the handicapped may be victims of discrimination in such areas as housing, employment, and

government services. See Section 504 of the Rehabilitation Act of 1973, Pub.L. No. 93–112, 87 Stat. 394, 29 U.S.C. § 794; Act of December 19, 1974, P.L. 966, No. 318, amending Pa. Human Relations Act, 43 P.S. § 951 et seq. (Supp.1975).

21. Plaintiff's expert witness Dr. Edward Huntington has studied the concerns of school officials regarding the employment of blind teachers. Dr. Huntington determined that a blind person could be a successful teacher of sighted children. Although Dr. Huntington did not study any large urban school districts, his testimony is relevant to the methods blind teachers can use to overcome certain obvious problems.

22. Some of the potential problem areas studied by Dr. Huntington were lunchroom and study hall supervision, teacher safety, administering tests, use of visual aids and chalk board, keeping written records, maintaining discipline and pupils' attention, and teaching various subjects. In schools where blind teachers were employed these problems either did not arise or were overcome through special arrangements. For example, Dr. Huntington found that the great majority of blind teachers maintained average or better than average classroom discipline. Blind teachers frequently were not assigned to lunchroom or playground supervision. Most blind teachers had no trouble operating audio-visual equipment and the majority were able to use the chalk board. However, blind teachers frequently used students to write on the blackboard or distributed mimeographed materials. For administering tests, either no special arrangements were made or the blind teachers used teachers who had study halls or students as proctors. A blind teacher could keep written records through use of braille or a typewriter. School administrators reported that English was the second most feasible subject (after social studies) for a blind teacher. Finally, school administrators who supervised blind teachers reported that the great majority were average or above average teachers.

23. The fact that over 400 blind persons are teaching nationally and the testimony of Dr. Huntington that many blind teachers can overcome their handicap and are rated as average or above average teachers shows that there was no rational basis for the School District's practice of completely excluding blind teachers from teaching sighted students.

24. The School District apparently discontinued its policy of completely prohibiting blind persons from taking the teacher's examination in the spring of 1974 when Ms. Gurmankin was allowed to take the examination. Nevertheless, the evidence does not indicate that any formal communication announcing this change in policy was distributed to personnel employees. In fact, Dr. Martin Ferrier, Director of Professional Personnel for the School District stated on May 8, 1975, that the current policy included "a restriction on the blind teaching the sighted."

25. The oral examiners for Ms. Gurmankin were Mr. Timothy Burris and Dr. Irene Reiter, both of whom had had no prior contact with blind teachers or blind applicants for teaching positions. Since the examiners did not know who they would be interviewing they did not undertake any special preparations to become better informed of the problems or capabilities of blind teachers.

26. The purpose of the oral interview is to inquire into areas that cannot be tested by a written examination, such as the applicant's experiences student teaching, and her ability to cope with stress, relate to others, and deal with students.

27. Because Ms. Gurmankin was blind and had a letter of recommendation from a member of the School Board, both oral examiners provided written comments with their evaluations.

Dr. Reiter noted that Ms. Gurmankin had the necessary "paper credentials" but probably could not function "unassisted" in the Philadelphia school system. Dr. Reiter expressed concern over Ms. Gurmankin's inability to maintain disci-

pline and grade written work without help, and commented that Ms. Gurmankin "cannot do any kind of on-the-spot classroom corrections on written material." Dr. Reiter also commented that Ms. Gurmankin could not independently evaluate books or other materials, and that many special helpers would be needed for record keeping, although that was not a major deterrent.

Mr. Burris noted that Ms. Gurmankin "had all the academic qualifications and requisites for teaching English" but he expressed concern about her ability to correct grammar and composition exercises, to use mixed media equipment, and to control classroom behavior. Mr. Burris stated that "record keeping itself may prove insurmountable along with housekeeping." He commented on Ms. Gurmankin's reluctance to teach in special education programs and expressed concern with her ability to operate in emergency situations requiring sight and agility.

28. Both oral examiners testified at the trial of this case and offered further explanations of the scores they gave Ms. Gurmankin on the examination.

Mr. Burris testified that Ms. Gurmankin generally gave brief and incomplete answers showing lack of information about procedures and methods of teaching. More particularly, Mr. Burris stated that Ms. Gurmankin's answers indicated that she placed too much stress on oral reading, would be unable to do in-class corrections of students' work, was unaware of the need to teach at different levels within each class, would not use visual aids properly and would need expert help in maintaining classroom control.

Dr. Reiter stated that the 74 she gave Ms. Gurmankin was a fair grade. Dr. Reiter felt that Ms. Gurmankin gave insufficient attention to the presence of disruptive students in today's classes, and that she would be unable to keep up with contemporary novels. Dr. Reiter testified that Ms. Gurmankin's answers generally were not thorough.

29. The written comments of the interviews indicate that the interviewers improperly considered certain factors in grading Ms. Gurmankin. For example, both interviewers noted record keeping as a problem, but neither asked Ms. Gurmankin how this problem might be overcome, and Dr. Huntington's testimony indicates that record keeping in fact is not a serious problem for blind teachers. Similarly, the examiners concluded that Ms. Gurmankin probably could not function without in-class assistance while Ms. Gurmankin's answers indicated that the assistance of students in her classes and a reader at home would be sufficient in most situations. Dr. Reiter noted that Ms. Gurmankin would not be able to keep up with contemporary literature, but she never gave Ms. Gurmankin a real opportunity to explain how that might be accomplished.

30. At the hearing on this case the interviewers' explanations of their scores criticized Ms. Gurmankin's answers for not addressing a number of pedagogical concerns that should have been mentioned. However, a reading of the transcript of the interview indicates that most of the questions were directed toward how a blind person would do certain mechanical things, such as teach reading or poetry, or operate equipment. Ms. Gurmankin had been told that she would be addressed questions not normally asked of other applicants, and she reasonably interpreted most of the questions to be particularly concerned with the problems of a blind teacher. If the interviewers had broader, pedagogical concerns, they were never expressed to Ms. Gurmankin through follow-up questions.

31. After examining the transcript of the oral interview, and the written comments and testimony of the interviews, I have concluded that Ms. Gurmankin was not evaluated fairly. The grading of the oral examination was based, at least in part, on misconceptions and stereotypes about the blind and on assumptions that the blind simply cannot perform, while

the facts indicate that blind persons can be successful teachers.

32. The School District can reasonably and legitimately consider an applicant's blindness in evaluating his or her qualifications for a teaching position. Dr. Huntington's testimony indicated that blind persons could be successful teachers, but that special arrangements were necessary in some areas. For example, blind teachers usually were not assigned to lunchroom or playground supervision, and special arrangements sometimes had to be made for administering tests or keeping records. The special problems encountered by blind teachers and the kinds of adjustments in normal school procedures that may be necessary are relevant to a school district's evaluation of a blind applicant for a teaching position.

In Ms. Gurmankin's case, however, the interviewers frequently did not give her an opportunity to explain how she might overcome her handicap, nor did the interviewers have sufficient background information to properly evaluate the prospects of a blind applicant for a teaching position.

33. In January of 1975, the school district offered Ms. Gurmankin two teaching positions because her name was reached on the teachers' eligibility list. Ms. Gurmankin could not qualify for one of the positions because it was for a combination music and English teacher, and she did not know music well enough. The second offer was for the Catto School. The Catto School is a remedial disciplinary school for boys. Ms. Gurmankin testified that the person who made these offers advised her against accepting a position at the Catto School, and that a guidance counselor at the school also discouraged her. Ms. Gurmankin declined both offers.

34. In July of 1975, shortly before the trial of this case, 12 or 13 additional schools were offered to Ms. Gurmankin. These were all junior high schools. Ms. Gurmankin refused to accept these offers, apparently because she contended in this suit that she was entitled to five

or six years seniority and should be able to get a more desirable assignment.

35. Even if Ms. Gurmankin had five years seniority, she would not necessarily be assigned to the school of her choice. The more desirable schools in the Northeast, District 8, have lower turnover rates and longer waiting lists for transfers than other Philadelphia schools. Moreover, a teacher's opportunities to transfer are also limited by the requirements that the school district maintain racial balances in teaching staffs. Ms. Gurmankin probably would not be able to transfer to a school in District 8 at this time even if she had five years seniority.

36. The educational activities and programs of the School District of Philadelphia receive substantial amounts of federal assistance.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the plaintiff's claims by virtue of 42 U.S.C. § 1983, 28 U.S.C. § 1343(3) and (4), and 28 U.S.C. § 1331(a).

2. The Philadelphia School District's refusal to consider blind persons to be teachers of sighted students in Philadelphia public schools violated Ms. Gurmankin's due process rights under the Fourteenth Amendment. See *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973); *Hoffman v. Ohio Youth Commission,* C 71–263 (N.D. Ohio, March 25, 1975) (unreported decision) (dictum).

3. The appropriate remedy for the defendants' infringement of Ms. Gurmankin's constitutional rights is that she be offered employment as a secondary school English teacher, with full seniority and other rights as though she had commenced employment in September, 1970.

4. The Court need not resolve the plaintiff's other claims of discrimination, since further relief would not be necessary even if discrimination were found.

5. The Court will reserve decision on the plaintiff's claims for back pay and counsel fees.

## DISCUSSION

▆▆▆▆ The plaintiff brought this action on due process, equal protection and statutory grounds. I first will consider federal statutory law to determine if the issues raised by this case can be resolved without reaching constitutional questions. The plaintiff relies on Section 504 of the Rehabilitation Act of 1973:

"No otherwise qualified handicapped individual in the United States, as defined in section 706(6) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794

While I have been unable to find any reported decisions construing section 504 of the Rehabilitation Act of 1973, it seems reasonably clear that a refusal to hire a blind person as a teacher is the kind of discrimination which that section was meant to prohibit. A blind person certainly is a "handicapped individual" as defined in the Act,[1] and the educational activities conducted by the School District of Philadelphia do receive financial assistance from the federal government. One of the specific purposes of the Rehabilitation Act was to "promote and expand employment opportunities in the public and private sectors for handicapped individuals and to place such individuals in employment." 29 U.S.C. § 701(8).

Nevertheless, the Rehabilitation Act of 1973 is not dispositive of the plaintiff's claims in this case. Although the Act became effective in December of 1973,

see 29 U.S.C. § 790, Ms. Gurmankin had been seeking a teaching position since 1969 or earlier. Consequently, many of her claims are based on actions by the school district which took place prior to December, 1973. In fact, the school district discontinued its policy of refusing to allow blind persons to take the teacher's examination shortly after the Rehabilitation Act took effect, when Ms. Gurmankin was given an examination in early 1974. Thus, Ms. Gurmankin's claim that the school district's prior policy violated her rights cannot be resolved without considering her constitutional arguments.

In attempting to analyze the plaintiff's due process and equal protection claims, I once again have the uncomfortable feeling that I am playing a shell game without being sure there is a pea.[2] This uncomfortable feeling is enhanced by the complete absence of any reported cases adjudicating on the merits the constitutional rights of the blind.

The plaintiff primarily relies on *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974), to challenge the school district's policy of completely excluding blind persons from teaching sighted students. In *LaFleur* the plaintiffs were challenging a mandatory maternity leave policy under which a pregnant teacher in the Cleveland, Ohio public schools was required to take maternity leave without pay beginning five months before the expected birth of her child. To justify these mandatory maternity leave rules, the school boards asserted that rigid rules were necessary to maintain continuity of instruction, to protect the health of the teacher and the unborn child, and to assure that students have a physically capable instructor in the classroom at all

---

1. For the purposes of this section, "handicapped individual" means "any person who (A) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (B) has a record of such an impairment, or (C) is regarded as having such an impairment." 29 U.S.C. § 706(6).

2. See *Vorchheimer v. School District of Philadelphia,* 400 F.Supp. 326, 340–41 (E.D.Pa. 1975), rev'd, 532 F.2d 880 (3d Cir. 1976). Apparently the Court of Appeals found the pea under a different shell than I had found it under.

times. The Court concluded that the mandatory maternity leave policy had no rational relationship to the valid state interest of preserving continuity of instruction, and that even though the leave policy did insulate the classroom from the presence of physically unfit teachers, a legitimate state interest, the leave policy violated the due process clause of the Fourteenth Amendment. The Court viewed the maternity leave rules as establishing an irrebuttable presumption of physical incompetency, even though many teachers would be able to continue working beyond the arbitrary cutoff dates. Citing *Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973) and *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1971), the Court held that such an irrebuttable presumption was a violation of due process of law. The sweeping mandatory leave policies unduly penalized female teachers for deciding to bear a child, so that the school boards should have employed alternative methods, such as medical examinations, for keeping physically unfit teachers out of the classroom.

■ The irrebuttable presumption analysis of *LaFleur* is also applicable in the instant case. The school board's policy of totally excluding blind persons as teachers of sighted students created an irrebuttable presumption that blind persons could not be competent teachers. However, since the evidence in this case indicates that some blind persons can be successful teachers, the school district's presumption is unconstitutionally broad. Thus, even though the school district's apparent goal of insuring that only competent teachers are hired is proper and legitimate, the refusal of the school district to even consider blind persons for teaching positions cannot be justified.[3]

If *LaFleur* were the latest case from the Supreme Court on irrebuttable pre-

sumption analysis, the school district's exclusion of blind teachers could be invalidated rather easily. However, the Court recently has limited the use of irrebuttable presumptions as a means of challenging classifications. See *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). *Salfi* involved a challenge to Social Security regulations under which surviving wives and step-children are denied benefits if their respective relationships did not last at least nine months before the wage earner's death.[4] Despite the fact that the challenged regulation seems to create a conclusive presumption that relationships that do not endure at least nine months are not legitimate, the Court refused to apply the doctrine of irrebuttable presumptions. Rather, the Court used more traditional equal protection analysis, and relied on a number of cases which had dealt with social welfare legislation.[5] On this basis, the Court upheld the regulations as reasonably related to a legitimate legislative purpose.

In *Salfi,* Justice Rehnquist distinguished *LaFleur* and other irrebuttable presumption cases on the basis of the interests that were being protected in those cases. Rights to conceive and to raise children enjoy constitutionally protected status, in sharp contrast to a non-contractual claim to receive funds from the public treasury, as asserted in *Salfi.* Where the interest asserted is only claims for disability payments, Congress could rationally conclude that the expense and difficulty of individual determinations justified a broad prophylactic rule.

Confronted with these two seemingly inconsistent opinions, I believe that *LaFleur* is the more appropriate precedent. Ms. Gurmankin's interest in public employment, though it may not be a "fundamental right," [6] is certainly more

---

3. See *Hoffman v. Ohio Youth Commission,* No. C 71–263 (N.D. Ohio, March 25, 1975, at 13) (dictum).

4. See 42 U.S.C. § 416(c).

5. See, e. g., *Richardson v. Belcher,* 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971); *Dandridge*

*v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)

6. See *Koelfgen v. Jackson,* 355 F.Supp. 243 (D.C.Minn.1972), aff'd 410 U.S. 976, 93 S.Ct. 1502, 36 L.Ed.2d 173 (1973).

important than the "right" to receive social security benefits in *Salfi.* In addition, Ms. Gurmankin's blindness permanently sets her apart from other people in a way that may cause her to be treated differently from other people in every activity she attempts to engage in. This is a far different kind of classification than was involved in *Salfi,* and it is one that demands a greater degree of constitutional protection. The persons alleging discrimination in *Salfi* had had relationships with a deceased wage earner that had not lasted at least nine months. Although such persons are denied disability benefits because they are classified in a particular way by the social security regulations, presumably they are not subjected to other disadvantages because they are so classified. Thus, the classification at issue in *Salfi* is artificial and is one that perhaps may be more appropriately evaluated on traditional equal protection grounds. On the other hand, the blind, like pregnant school teachers, are an objectively defined group that should not be subjected to inaccurate and irrebuttable presumptions of incompetence.

Most importantly, the decision in *Salfi* to a great extent was based on the administrative difficulty and expense of having individual determinations of the genuineness of marital relationships. As the Court stated,

"Large numbers of people are eligible for these programs and are potentially subject to inquiry as to the validity of their relationships to wage earners. These people include not only the classes which appellees represent, but also claimants in other programs for which the Social Security Act imposes duration-of-relationship requirements. Not only does the prophylactic approach thus obviate the necessity of large numbers of individualized determinations, but it also protects large numbers of claimants who satisfy the rule from the uncertainties and delays

of administrative inquiry into the circumstances of their marriages. Nor is it at all clear that individual determinations could effectively filter out sham arrangements. . . . 422 U.S. at 781–82, 95 S.Ct. at 2475, 45 L.Ed.2d at 548–49. (footnotes omitted).

The Court concluded that Congress rationally could determine that generalized rules were appropriate and that "the difficulties of individual determinations outweigh the marginal increments in the precise effectuation of congressional concern" which individual consideration might be expected to produce. *Weinberger v. Salfi,* 422 U.S. 749, 785, 95 S.Ct. 2457, 2476, 45 L.Ed.2d 522, 550 (1975).

The administrative concerns cited by the Court in *Salfi* simply are not present in the instant case. Requiring the school district to give blind applicants for teaching positions an opportunity to demonstrate their competence through the teacher's examination and an oral interview would not lead to a great many such "hearings," since relatively few blind persons are likely to apply.[7] In fact, "hearings" in the form of written examinations and personal interviews apparently have been routinely given to all applicants except the blind. Similarly, there is nothing in the evidence to indicate that the potential ability of blind applicants as teachers could not be evaluated through the written examination and oral interview, in the same manner that sighted applicants are considered.

■ Given Ms. Gurmankin's interest in obtaining employment and the insignificance of the burdens that would be placed on the school district if it allowed blind persons an opportunity to demonstrate their competence, I find that the Philadelphia School District's policy of refusing to consider blind persons to be teachers for sighted students created an irrebuttable presumption in violation of

---

**7.** As the defendants have pointed out, the evidence indicates that Ms. Gurmankin is the only blind person who has applied for a position to teach sighted students.

the plaintiff's due process rights. In utilizing the irrebuttable presumption analysis of *LaFleur*, I am not unmindful of Justice Rehnquist's warning that this doctrine could become "a virtual engine of destruction for countless legislative judgments which have heretofore been thought wholly consistent with the Fifth and Fourteenth Amendments to the Constitution." *Weinberger v. Salfi*, 422 U.S. 749, 772, 95 S.Ct. 2457, 2470, 45 L.Ed.2d 522, 543 (1975). However, the importance of the plaintiff's interest and the ease with which a hearing can be provided distinguish this case from most other challenges to legislative classifications, and make this an appropriate case for applying irrebuttable presumption analysis.[8]

■ In addition to challenging the school district's policy of completely excluding blind teachers for sighted students before 1974, Ms. Gurmankin also has alleged that the oral interview that she did have in 1974 was evaluated in a discriminatory manner. I need not reach this issue, however, since Ms. Gurmankin was given a passing score on the examination and eventually was offered employment based on her score. The harm she has suffered primarily was caused by the school district's refusal to even consider her application before 1974.

Nevertheless, because a large part of counsel's energies and the testimony at trial concerned Ms. Gurmankin's oral interview, I have made findings of fact on that issue, and some discussion is warranted. Merely requiring that blind persons be considered for teaching positions will be a meaningless gesture if such applicants are not evaluated fairly. In this case I have found that Ms. Gurmankin's interview was not graded fairly, mainly because of the interviewers' lack of information concerning the capabilities of blind teachers and the kinds of adjustments that a blind teacher can make to overcome apparent problems. Similarly, the school district discriminated against Ms. Gurmankin by refusing to give her student teaching "score points," after she had been excluded from student teaching sighted students in Philadelphia public schools because of her blindness. Although I am unable to predict what score Ms. Gurmankin would have received if she had been evaluated properly, it is clear that due process requirements will not be met if test results are based on misconceptions and stereotypes about the blind, as was true in this case.

A strong argument also can be made that the school district's testing procedures violated section 504 of the Rehabilitation Act of 1973, which has been discussed previously. See 29 U.S.C. § 794. Although that section protects only "otherwise qualified" handicapped individuals, whether Ms. Gurmankin meets that requirement clearly requires a nondiscriminatory evaluation of her competency. In this regard the special problems encountered by blind teachers certainly must be considered, but the fact that several hundred blind persons are successful teachers indicates that Ms. Gurmankin's blindness does not automatically prevent her from being "otherwise qualified."

■ The final point for discussion is what relief is appropriate. I have found that the school district's policy of totally excluding blind persons as teachers of sighted students violated the plaintiff's constitutional rights. The evidence in this case indicates that Ms. Gurmankin inquired about employment opportunities in 1969, but was summarily rejected be-

---

8. Because my decision in this case is based on the due process reasoning of *LaFleur*, I have no occasion to consider the equal protection arguments that have been stressed by the parties. I will note, however, that the plaintiff's claim that the blind constitute a "suspect classification" is insupportable. Even admitting that the blind are a small, politically weak minority that has been subjected to varying forms of prejudice and discrimination, the limitations placed on a person's ability by a handicap such as blindness cannot be ignored. Unlike distinctions based on race or religion, classifications based on blindness often can be justified by the different abilities of the blind and the sighted.

cause of her blindness. After she was finally considered in the spring of 1974, the school district offered her employment in January, 1975 (two unsatisfactory schools) and July, 1975. In light of the great number of secondary school English teachers hired by the School District of Philadelphia since 1969, it is reasonable to assume that if Ms. Gurmankin had been allowed to take the teacher's examination in 1969, she would have been offered suitable employment by September of 1970. Consequently, Ms. Gurmankin should be offered employment with seniority rights and all other benefits accruing to a secondary school English teacher who commenced employment in September, 1970.

The plaintiff also has requested back pay and a reasonable attorney's fee. The parties have not briefed these matters, and consequently I will reserve decision at this time.