**BIG BROTHERS, INC., and Paul J. Rimarcik, petitioners, Respondents,**

v.

**MINNEAPOLIS COMMISSION ON CIVIL RIGHTS, Respondent,**

and

**Gary E. Johnson, complainant, Appellant.**

**No. 48950.**

Supreme Court of Minnesota.

July 27, 1979.

Wetherbee & Baker and Jack Baker, Minneapolis, Patsy D. Reinard, Minnesota Civil Liberties Union, Minneapolis, amicus for appellants.

Stuurmans & Kelly and Timothy D. Kelly, Minneapolis, for respondent Big Brothers, Inc., and Paul J. Rimarcik.

Robert J. Alfton, City Atty., Mark A. Flahavan, Asst. City Atty., Minneapolis, for respondent Mpls. Comm. on Civil Rights.

KELLY, Justice.

Gary E. Johnson, complainant, appeals from an order of the Hennepin County District Court that permits Big Brothers, Inc. to question applicants who wish to be big brothers about their sexual or affectional preferences and to communicate such information to the mothers of potential little brothers. We affirm.

Big Brothers, Inc. is a non-profit corporation which provides charitable services to boys. One of Big Brothers' services involves matching volunteer "big brothers" with boys who do not have fathers or other significant adult male contact.

On or about November 18, 1974, Gary E. Johnson applied to be a big brother. He gave several references, one of which was Jack Baker, a well-known spokesman for homosexuals. Johnson was subsequently interviewed by Mr. Daniel E. Kirk, a caseworker, on two occasions. During the second interview Kirk asked Johnson whether his reference, Jack Baker, was the "Jack Baker who was the homosexual spokesman * * *." Johnson said he was, and Kirk asked if Johnson was a homosexual too. Johnson indicated that he was, and Kirk stated that he would have to consult with Paul J. Rimarcik, Executive Director of Big Brothers, Inc. to determine the agency's policy on homosexuals as potential big brothers. Rimarcik, Kirk, Johnson, and Baker, who was Johnson's legal counsel, met on December 13, 1974, to discuss the issue. In a letter dated January 7, 1975, Rimarcik stated that the personality and character of prospective big brothers are discussed in detail with the potential little brother and his mother and that information relative to affectional preference also would be shared with them. Johnson

then refused to proceed with his application until he received a definitive ruling on whether or not this constituted illegal discrimination. On January 10, 1975, Johnson filed a complaint with the Minneapolis Department of Civil Rights.[1] Based on an opinion of the city attorney that Big Brothers did not fall within the definition of a "public accommodation" in the Minneapolis Civil Rights Ordinance,[2] the director of the Department of Civil Rights refused to investigate the complaint. Johnson initiated another action in the Hennepin County District Court as a result of which the district court ordered the Minneapolis Commission on Civil Rights "to promulgate suitable rules and regulations and standards * * * to be considered * * * in determining whether or not an organization falls within the contemplation of the Ordinance." Pursuant to this order, the commission recommended to the Minneapolis City Council that the following definition of "public accommodations" be adopted:

"'Public Accommodations' includes without limitation all services or facilities, other than governmental, of any kind offered or located within the City of Minneapolis which are generally open or offered to the public or which generally solicit public patronage or usage, whether operated for profit or not."

On December 30, 1975, the city council adopted this definition.[3]

On February 5, 1976, the District Court of Hennepin County also ordered the director of the Department of Civil Rights to investigate whether probable cause existed to believe that the allegations of discrimination in Johnson's complaint were well-founded.[4] On August 16, 1976, the director concluded that the allegations of discrimination were well-founded and made a series of recommendations aimed at conciliation between the parties. Big Brothers, Inc. rejected the recommendations and the case was referred to a special hearing examiner. A hearing was held on March 4, 1977, on stipulated facts and affidavits, both parties having filed motions for summary judgment.[5] On March 25, 1977, the special hearing examiner made findings of fact that Big Brothers is a public accommodation, that a classification scheme based on sexual preference is a suspect classification, and that there is no rational basis for disclosing only one type of sexual preference (i. e., homosexual). The examiner concluded that the gathering of information by Big Brothers as to affectional or sexual preference is not unlawful but that:

"Big Brothers, Inc. must either cease to inquire as to the sexual or affectional preference of any volunteer applicants or it must reveal the sexual and/or affectional preference of all volunteer applicants to prospective end-users of their

1. In his complaint Johnson stated: "I believe that Big Brothers, Incorporated; its Board of Directors; Paul Rimarcik and Dan Kirk have refused to provide me access to the services of and benefit from Big Brothers, Incorporated, a public accommodation, based on affectional or sexual preference in violation of Chapter 945.-030(A)(5) of the Minneapolis Code of Ordinances." (Daniel Kirk was subsequently dropped from the action.)

2. The statute stated: "'Public accommodations' includes the services and facilities of any and all places of business within the City of Minneapolis engaged generally in the provision of services or goods to the public or soliciting generally the public patronage, including, without limitation, theaters, hotels, motels, restaurants, taverns, barber shops, beauty shops, insurance companies, lending organizations, financial institutions, and carriers." Minneapolis Code of Ordinances (1974), § 945.020(1).

3. The city council also eliminated the references to "sexual preference" throughout the ordinance. Intimate homosexual conduct was, and is, illegal in Minnesota, even if consensual. See, Minn.St. 609.293, subd. 5. The phrase "affectional preference" remained in the ordinance, however.

4. The court's order for judgment was premised upon 10 findings of fact which included a finding that prior to the action taken by the Minneapolis City Council on December 30, 1975, the director of the Minneapolis Department of Civil Rights was required to interpret the Civil Rights Ordinance as though public accommodations and public services were as defined by the Minneapolis Commission on Civil Rights.

5. By stipulation, the issues of liability and remedy were to be considered separately, with the hearing considering only liability.

services, or as to none of such volunteers."

The examiner concluded that because Big Brothers had not yet disseminated information of Johnson's sexual or affectional preferences, no discrimination had occurred.

The case was appealed to the district court where both parties again moved for summary judgment. The district court modified the special hearing examiner's conclusions of law. As modified, Big Brothers may question applicants regarding their sexual or affectional preferences and may communicate this information to the mothers of little brothers. Further, communication of sexual or affectional preferences to mothers only where it is same-sex directed does not accord adverse or unequal treatment to homosexuals under the Minneapolis Civil Rights Ordinance and is not a discriminatory use of the information.

Complainant Johnson appeals from this order contending that the Minneapolis Civil Rights Ordinance [6] prohibits inquiry or communication of affectional preference by Big Brothers, Inc. Big Brothers, Inc. contends that such a construction of the ordinance would interfere with a mother's right to raise her child,[7] as well as with Big Broth-

---

**6.** At the time the complaint was filed, the Minneapolis Civil Rights Ordinance stated:

"'Discrimination' means any act or attempted act which because of race, color, creed, religion, ancestry, national origin, sex, affectional or sexual preference, disability, or age, results in the unequal treatment or separation or segregation of any person, or denies, prevents, limits, or otherwise adversely affects, or if accomplished would deny, prevent, limit, or otherwise adversely affect, the benefit or enjoyment by any person of employment, membership in a labor organization, ownership or occupancy of real property, a public accommodation, a public service, or an educational institution. Such discrimination is unlawful and is a violation of this ordinance." *Minneapolis Code of Ordinances* (1974), § 945.020(r).

"'Affectional or sexual preference' means having or manifesting an emotional or physical attachment to another consenting person or persons, or having or manifesting a preference for such attachment." Minneapolis Code of Ordinances (1974), § 945.020(s).

"Without limitation, the following are declared to be discrimination:

\* \* \* \* \* \*

"(5) For any person engaged in the provision of public accommodations, because of race, color, creed, religion, ancestry, national origin, sex, affectional or sexual preference, disability, or age, to fail or refuse to provide to any person access to the use of and benefit from the services and facilities of such public accommodations; or to accord adverse, unlawful, or unequal treatment to any person with respect to the availability of such services and facilities, the price or other consideration therefor, the scope and quality thereof, or the terms and conditions under which the same are made available, including terms and conditions relating to credit, payment, warranties, delivery, installation, and repair." Minneapolis Code of Ordinances (1974), § 945.030(a)(5).

On December 30, 1975, the ordinance was amended to read as follows:

"'Discriminate' or 'discrimination' includes any act, attempted act, policy or practice, which results in the unequal treatment, separation or segregation of or which otherwise adversely affects any person who is a member of a class protected by this title." Minneapolis Code of Ordinances, § 139.20(g).

"'Affectional preference' means having or manifesting an emotional or physical attachment to another consenting person or persons, or having or manifesting a preference for such attachment, or having or projecting a self-image not associated with one's biological maleness or one's biological femaleness." Minneapolis Code of Ordinances, § 139.20(x).

"Without limitation, the following are declared to be unfair discriminatory acts:

\* \* \* \* \* \*

"(h) For any person engaged in the provision of public accommodations, because of race, color, creed, religion, ancestry, national origin, sex, affectional preference, disability, marital status, or status with regard to public assistance:

"(1) To fail or refuse to provide to any person access to the use of and benefit from the services and facilities of such public accommodations; or

"(2) To discriminate against any person with respect to the availability of such services and facilities, the price or other consideration therefor, the scope and quality thereof, or the terms and conditions under which the same are made available, including terms and conditions relating to credit, payment, warranties, delivery, installation and repair." Minneapolis Code of Ordinances, § 139.40(h).

**7.** Big Brothers, Inc. contends that this is a constitutional issue, citing *Carey v. Population Services International,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed.

ers, Inc.'s freedom of speech. Big Brothers also contends that Johnson does not have standing in this action in any case. Because of our decision on Johnson's arguments, however, we need not reach the issues Big Brothers, Inc. raises other than the issue of standing as a preliminary issue.

██ Big Brothers argues that Johnson does not have standing to assert a charge of discrimination because he refused to complete the selection process. It is Big Brothers' contention that he cannot show that Big Brothers' policies have adversely affected him. Big Brothers points out that other applicants with histories of "negative aspects" or "disabilities" such as chemical dependency, psychiatric care, or criminal offenses have been successfully placed with little brothers. We note, however, that Johnson's basic contention is that his status is neither a negative aspect nor an aspect upon which Big Brothers may differentiate under the ordinance. Thus, "red-flagging" his status by discussing it with mothers of potential little brothers does adversely affect him if such treatment is discriminatory. By analogy, a house hunter could argue that a realtor's practice of informing each house seller that the house hunter was gay affects him even if the realtor could show that the house hunter could eventually find someone who would sell him a suitable house. Finally, we conclude that in a remedial statute such as the ordinance in question, persons attacking a policy rather than a specific incident should be recognized as having standing wherever possible.[8] Thus, we hold that Johnson does have standing in this case.

The Minneapolis Civil Rights Ordinance specifically states that no person may fail or refuse to provide access to the use of, and benefit from, the services of public accommodations. Minneapolis Code of Ordinances, § 139.40(h[1]). Big Brothers, Inc. did not refuse to serve the complainant here. Big Brothers did, however, declare that all prospective little brothers and their mothers would be informed of the potential big brother's affectional preference where it was same-sex directed.[9] The Minneapolis Civil Rights Ordinance also specifically states that no person may discriminate, because of affectional preference, with respect to the terms and conditions under which services of public accommodations are made available. Minneapolis Code of Ordinances, § 139.40(h[2]). Johnson contends that making only a gay big brother's affectional preference a matter to be made known to the mother is discrimination with respect to the terms and conditions under which Big Brothers' services are made available to him. Yet every potential big brother is subject to disclosure of important aspects of his lifestyle that differ from what the mother would perceive as a normal stereotype.[10]

██ As we read the ordinance, if the function of Big Brothers, Inc. in providing information, including protected informa-

1070 (1925); and *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). Though the district court agreed with this analysis, we express no opinion on the issue.

8. When this case was brought, the ordinance in question defined discrimination as an "act or attempted act," and it was only after December 30, 1975, that the statute contained the language including any "act, attempted act, policy, or practice." See, footnote 6, *supra.* It is apparent from the record, however, that the specific act or attempted act Johnson relies on is part of a continuing policy.

9. Big Brothers apparently followed this policy because of the assumption of the mothers that the big brother would normally follow the heterosexual male stereotype. This assumption was expressed by mothers of little brothers in a series of affidavits placed in evidence by Big Brothers, Inc.

10. One caseworker described the process as follows: "My goal in interviewing a prospective big brother is to find out as much about the person as possible and, although some questions are asked of all applicants, some applicants may have interests, attitudes, or other characteristics which require further inquiry into certain areas. For example, if an applicant had hobbies involving firearms, I might inquire intensively into that area since some mothers may not want their sons to be introduced to firearms. *On the whole, I am interested in anything which is a meaningful part of the applicant's life.*" (Italics supplied.)

tion, about big brothers is itself legitimate, then informing the mother of same-gender affectional preference should be considered a violation of the ordinance only if actual discrimination can be shown. No evidence exists in this case that actual discrimination occurred. Big Brothers, Inc. offered Johnson the use of their services. His affectional preferences would have been communicated to the mother of the potential little brother just as any other atypical trait of any other big brother would have been.

■ An examination of the arguments raised against Big Brothers, Inc.'s policy shows that what is actually opposed is Big Brothers, Inc.'s aiding in the selection in any way. Johnson admits that a mother can decide to whom she will entrust her child based on any factors she considers relevant. Johnson argues, however, that if affectional preference is important to her, then she must ask the question—Big Brothers may not point it out to her. The commission hearing examiner concluded that such discrimination could be avoided by requiring Big Brothers, Inc. to give affectional preference information in all cases, not just where the individual is gay. But the Minneapolis Civil Rights Ordinance prohibits discrimination on the basis of race, color, creed, religion, ancestry, national origin, sex, disability, marital status, and status with regard to public assistance, as well as affectional preference. Inquiry into all of these subjects would appear to be covered by Johnson's or the hearing examiner's arguments. The positions of both Johnson and the hearing examiner would thus eliminate the purpose of Big Brothers, Inc., i. e., to act as an agent of the mother and help provide the little brother and his mother with a father-figure who meets the moth-

er's and child's qualifications. Following Johnson's position, Big Brothers, Inc. would be primarily a conduit for the passage of questions from the mother to the potential big brother, and answers from the potential big brother to the mother, and would have no responsibility of its own. While this would avoid the possibility of discrimination by Big Brothers, Inc., it would also put the major burden of interviewing the potential big brother on the mother, severely undermining the entire purpose of Big Brothers. Under the hearing examiner's system, the mother would receive much information that might be irrelevant to her, and the potential big brother would be subject to mandatory intrusion into the areas of privacy and self-determination the ordinance was designed to protect. We believe that neither system is logically required by the Minneapolis Civil Rights Ordinance. The Minneapolis Civil Rights Ordinance is designed to prevent discrimination on certain grounds, not to grant special rights with respect to those areas. Where a legitimate differentiation of individuals is being made on the basis of a variety of factors, some of which are protected under the ordinance, proof of actual discrimination should be required as to the protected factors unless the ordinance provides a specific alternative definition of discrimination as with employment practices.

Amicus, Minnesota Civil Liberties Union, contends that the relationship of Johnson to Big Brothers, Inc. is analogized to the relationship of a potential employee to an employment agency. Amicus thus concludes that, under § 139.40(d[1]) (discriminatory practices in furnishing employment information and employment advertising),[11] it is impermissible for Big Brothers, Inc. to inquire into any of the protected criteria,

---

11. Minneapolis Code of Ordinances, § 139.-40(d[1]), states: "Without limitation, the following are declared to be unfair discriminatory acts:

\* \* \* \* \* \*

"(d) Except when based on a bona fide occupational qualification, for an employer, employment agency, or labor organization, before a person is employed by an employer or admitted to membership in a labor organization:

"(1) To require a person to furnish information that pertains to race, color, creed, religion, ancestry, national origin, sex, affectional preference, disability, age, marital status, or status with regard to public assistance, unless:

"a. For the purpose of national security, information pertaining to national origin is required by the United States, this state, or a political subdivision or agency of the United States or this state; or

including affectional preference, without showing that the criteria is a bona fide occupational qualification.[12] We do not find amicus' arguments to be convincing. An employment relationship is primarily based on specific criteria which have an objective basis while the big brother relationship is necessarily subjective. Further, a potential big brother volunteers to be a big brother free of any coercion. The economic need of a potential employee to find a job to provide food and shelter is not present in amicus' analogy.

In a situation such as this, we will not apply the standard of the employment situation without a clear expression of legislative intent.

Affirmed.

ROGOSHESKE, J., took no part in the consideration or decision of this case.

"b. For the purpose of compliance with the Public Contracts Act or any rule, regulation or laws of the United States or of this state requiring information pertaining to race, color, creed, religion, ancestry, national origin, sex, affectional preference, disability, age, marital status, or status with regard to public assistance is required by the United States, this state, or a political subdivision or agency of the United States or this state."

12. Amicus also contends that, even if Big Brothers, Inc. is considered to be under the public accommodation section, the prohibition against any inquiry should still be required. Amicus reaches this conclusion by noting that in most public accommodation situations inquiry does not occur. That is, a gas station attendant will not inquire as to one's affectional preference before serving him. Amicus apparently believes that is why inquiry was not prohibited in the area of public accommodations. Thus, where inquiry does occur, amicus feels it should be limited not to include subjects protected under the Minneapolis Civil Rights Ordinance.

The fact that the ordinance specifically forbids inquiry in some areas suggests, however, that inquiry is not forbidden in the area of public accommodations.