{¶ 55} Establishing public policy is complicated business. Throughout this country's history, federal and state governments have passed various laws grounded in concerns over what should be done to save people from themselves.
 {¶ 56} For example, we have a plethora of paternalistic legislation and judicial decision making based on "indisputable" natural law and thinly veiled religious dogma that portrays women and other folk as fragile and somewhat moronic creatures incapable of protecting or thinking for themselves. Radice v. New York (1924), 264 U.S. 292, 294
(upholding a conviction for a violation a law that prohibited the employment of women in restaurants between the hours of 10:00 p.m. and 6:00 a.m. based on the legislature's finding that "night work is substantially and especially detrimental to the health of women.").
 {¶ 57} In Muller v. Oregon (1908), 208 U.S. 412, 421-422, the United States Supreme Court noted the following:
 {¶ 58} "That woman's physical structure and the performance of maternal functions place her at a disadvantage in the struggle for subsistence is obvious. * * *
 {¶ 59} "Still again, history discloses the fact that woman has always been dependent upon man. * * * Though limitations upon personal and contractual rights may be removed by legislation, there is that in her disposition and habits of life which will operate against a full assertion of those rights. * * * Differentiated by these matters from the other sex, she is properly placed in a class by herself, and legislation designed for her protection may be sustained, even when like legislation is not necessary for men and could not be sustained. * * * Even though all restrictions on political, personal and contractual rights were taken away, * * * it would still be true that she is so constituted that she will rest upon and look to him for protection; that her physical structure and a proper discharge of her maternal functions — having in view not merely her own health, but the well-being of the race — justify legislation to protect her from the greed as well as the passion of man. * * *"
 {¶ 60} Laws against miscegenation were judicially supported as efforts to preserve racial integrity and to "prevent the corruption of blood[.]" Loving v. Virginia (1967), 388 U.S. 1, 7. Slavery and other civil inequities were defended on the basis that "negroes" were inferior to whites. See, generally, Scott v. Sanford (1857), 60 U.S. 393, 407
(observing that because African-Americans had "been regarded as beings of an inferior order, and altogether unfit to associate with the white race, either in social or political relations; and so far inferior, that they had no rights which the white man was bound to respect; * * * the negro might justly and lawfully be reduced to slavery for his benefit."); Plessy v. Ferguson (1896), 163 U.S. 537 (upholding the "separate but equal" doctrine").
 {¶ 61} The establishment of our current civil rights legislation required that we rethink the long established history and origins of our prejudices. Without exception, the continuation of those prejudices was defended in the name of natural law, the God-given order of things, and because it had always been that way. Then, as today, the defenders of the status quo always seemed to have God's lips to their ears.
 {¶ 62} Not all of these decisions are a hundred years old or older. It was only recently that the Supreme Court of Ohio invalidated the criminal statute that prohibited homosexual, but not heterosexual, importuning. State v. Thompson, 95 Ohio St.3d 264, 2002-Ohio-2124, syllabus. Moreover, it was only in the last thirty years that the United States Supreme Court held that a requirement forcing pregnant teachers in the Cleveland school system to take maternity leave without pay beginning five months before the expected birth of the child was unconstitutional.Cleveland Bd. of Edn. v. LaFleur (1974), 414 U.S. 632 (also noting that some of the considerations underlying the leave policy were to save pregnant teachers from embarrassment of giggling schoolchildren, women "began to show" at the end of the fourth month of pregnancy, and to insulate schoolchildren from the sight of conspicuously pregnant women).
 {¶ 63} I understand that it is not always appropriate to apply modern sensibilities to prior decisions. That being said, certain questions are so obvious, and certain results are so clearly wrong, that we must look back and, like Dr. Phil, wonder "What were they thinking?"
 {¶ 64} A person reading the above examples of legislation and judicial decision making would be appalled at the generalizations and outright ignorance used by courts and legislatures to justify obviously unconstitutional laws. Today, however, the majority holds that, in an effort to protect the institution of marriage, a transgender person may not marry someone belonging to that person's original gender classification. In doing so, it claims to be protecting the sanctity of marriage. My question to them is "What is the danger?" How is anything harmed by allowing those, who by accident of birth do not fit neatly into the category of male or female, from enjoying the same civil rights that "correct sex" citizens enjoy? The state's "interest" in protecting the sanctity of marriage in this manner is totally suspect. I would hope that the General Assembly and the courts would have better things to do with their time than to manufacture ways to polarize and alienate significant portions of our citizenry when there is no need.
 {¶ 65} For these reasons, and as a matter of public policy, I respectfully dissent.